WATTS et al. v. UNITED STATES.

(District Court, S. D. New York. April 8, 1904.)

1. COLLISION—DAMAGES—FINDINGS OF COMMISSIONER.
The finding of a commissioner as to the value of a vessel sunk in collision, made on conflicting evidence, will not be disturbed unless error or mistake is clearly apparent.

2. SAME—SUIT AGAINST UNITED STATES—INTEREST.
A court of admiralty, in a suit brought against the United States, under a special act of Congress, to recover damages for the loss of a British vessel through collision with a naval vessel, has no authority to allow interest as a part of such damages, where the special act is silent on the subject; the general rule being that interest is not recoverable against the government, and such being the statutory rule governing suits in the court of claims.

In Admiralty. On exceptions to commissioner's report.
See 123 Fed. 105.

Wing, Putnam & Burlingham, for the exceptions.
Henry L. Burnett, U. S. Dist. Atty., and Arthur M. King, Asst. U. S. Dist. Atty.

ADAMS, District Judge. The first three exceptions relate to the value of the steamship Foscolia. They are:

"First. For that the Commissioner found the value of the Foscolia at the time of the collision at only $60,000 instead of £17,000 ($82,730) or £15,000 ($72,997) as testified to by the London witnesses, Burgess and Gordon respectively; also that the Commissioner by said valuation rejected in effect the estimates of the three New York witnesses called for the libellants, namely, Saunders, who proved a value at £14,538 ($70,654.68), Clark, who showed a valuation of £14,500 ($70,542.50), and Garmey, who appraised the ship at $63,611.94.

Second. For that the Commissioner did not regard, or did not give due and sufficient weight to, the high rates of freight proved to be prevailing in May 1898, which enhanced the earning power of cargo steamers like the Foscolia, and necessarily increased the market value thereof.

¶ 1. See Collision, vol. 10, Cent. Dig. § 306.

Third. For that in his valuation the Commissioner assumed that the Foscolia could as readily be sold here as in England, whereas the value of such a vessel in her home port, to wit, in London, is the correct measure of the owners' loss."

The finding of the Commissioner is not in accordance with the estimate of any one witness but his report shows that he reached his result through a consideration of all of the testimony. His conclusion was arrived at from conflicting evidence and should not be disturbed unless error or mistake is clearly apparent—Panama R. Co. v. Napier Shipping Co., Ltd., 61 Fed. 408, 9 C. C. A. 553; The Elton, 83 Fed. 519, 31 C. C. A. 496—which is not the case here. On the contrary, the award is a conservative one, taking into account the testimony adduced both here and in England and is consistent with the weight of the evidence.

The following is his report upon this subject, which I adopt:

"There is testimony on the part of her owners to the effect that the Foscolia had been a very profitable vessel, and some of the testimony taken by them in England on the question of value appears to have been largely influenced by this fact. Libellants' counsel argues that the value of the vessel to the owners is a better measure of damages than the estimates of experts, and quotes from the opinion of Mr. Justice Barnes in the Harmonides, 9 Asp. Mar. Cases, 354, in which this view is apparently taken. But the decisions of our courts are to the effect that this is not the proper test, and that in the absence of special circumstances the amount for which the vessel would have sold in the open market is the true test of value. Nor do I think that because of our navigation laws greater weight should be given to the London testimony than to that taken in New York, since one of the witnesses examined here stated that the value given by him was that of London, and the other New York witnesses did not take the navigation laws into consideration as affecting the value, it being assumed that, for the purposes of the enquiry, the Foscolia could be as readily sold here as in England.

The Foscolia was an iron steamship built at Newcastle, England, in 1879, at a contract price of £23,074. Some of the Government witnesses considered this a large sum to pay for her at that time, and it appears that bids were not asked for when she was built; but Mr. Burgess, one of the owners, testified that he knew what values were at that time and believed he got the lowest rates. Witnesses for the owners testified that iron vessels have more endurance than steel vessels, and this has not been disputed by the Government. The Foscolia was of the double-deck type, with three tiers of deck beams, had one iron deck and one deck partly iron and partly wood, high forecastle solid, bridge and high poop. She had compound engines, and her average speed was 9 knots when loaded, on a coal consumption of 12 tons per day. She was classed 100 A 1 with a star, in the British Lloyds, which is the highest class and indicates that she was built under a special survey. She had retained that class from the beginning, passing the periodical surveys, and she was entitled to be continued in it as long as her owners complied with the Lloyds requirements. Her last survey was in September, 1897, about seven months before her loss, and under it the vessel would have retained her class for four years, barring accidents. The engines and boilers were the same that were originally placed in her, but they had been subject to annual inspection, and in September, 1897, were certified for 12 months. From the time she was built her owners had spent £12,136/9/6 on her in repairs and renewals, and the testimony shows that she had been thoroughly kept up.

To prove value, two witnesses were examined in London on behalf of the owners, and one on behalf of the Government, besides the witnesses who testified here. Their values were given as of May, 1898, when the vessel was lost.

Mr. Burgess, one of the English owners, whose business and experience qualified him to testify on the subject, placed the value at £17,000. This is the highest estimate given by any witness, and his interest in the matter may

have led him to place too great a value on the vessel. Moreover, this appears to be his estimate of her commercial value to his firm, since he says: 'To us, a going concern, the steamer was worth at least £17,000.'

Mr. Gordon, the other London witness for the owners, was an officer of a company owning a large number of steamships, and had a long experience in the purchase, ownership and management of steamships. He valued the Foscolia at £15,000. He states that there was a demand for ships of her class at that time, not in England, but from foreigners, who were buying largely; such vessels were well adapted for the Baltic and Black Sea trades, but were not then being built in England. Mr. Gordon had never been aboard the vessel, although he had seen her some years before her loss. In explaining his method of fixing the value, he said that he took into consideration his own steamers of similar build and age, their insured values for that year, and their earning capacity. He also states that for this particular year, 'the earning quality of the boat is an absolute test of value.' Elsewhere, however, he disclaimed taking the insured value into consideration as an element, and said that his estimate was based upon his knowledge of ships of similar type and size. He seems to have been in error as to the age of the vessel, since he refers to her as 'practically new' in 1892, when in fact she was 13 years old. When asked what, under normal conditions, would be the percentage of deterioration for a vessel costing £23,074 in 1879, he said that he could not answer the question with reference to the Foscolia, since she was probably worth nearer £30,000 than £23,000 in 1881, and in the neighborhood of £29,000 when she was 5 years old, because vessel values increased enormously during that period.

Mr. Thompson, the London witness examined on behalf of the Government, was not a vessel owner, but was a surveyor and appraiser of vessels, and a naval architect and engineer; his experience, extending over some 40 years, included superintending the construction of ships and frequently testifying as to ship values in the admiralty courts. He valued the Foscolia at £11,000. He says, however, that if the owners had gone into the market in May, 1898, to contract for the building of a similar steamer, the cost would, in his judgment, have been about £23,000. He has no knowledge of the vessel beyond the records in Lloyds' Register. He said that in fixing the value, he assumed that she was a good dead weight carrier, that she was in a condition for sea, that her original boilers were still in her, and that no large structural repairs had been recently made; he had kept informed as to actual sales, and such sales had entered into his computation; the fact that the vessel's boilers had never been renewed materially affected his valuation.

Five witnesses were examined in New York on the question of value. These were Herbert B. Saunders, John Garmey and Arthur H. Clark on behalf of the owners, and Horace See and Thomas Congdon on behalf of the Government. Their estimates ranged from $70,654.68 to $52,500.

Mr. Saunders is a marine appraiser and surveyor for underwriters, and has acted in this port about 4 years. His knowledge of the Foscolia was derived from Lloyds' Register, although he said that he had seen the vessel and 'went across her' on one occasion. There is some confusion in his figures, since he changed his result once or twice because of inaccurate data on which he had made his calculations, and errors in computing, but after making his corrections he testified that the value was £14,538, or $70,654.68. He worked out this result by applying a system of deductions for depreciation at various stages in the life of the ship.

Mr. Garmey is superintendent of the Prince Line, which has a large number of cargo steamships plying in various parts of the world, he has bought and sold vessels and had occasion to value and appraise them. His knowledge of the Foscolia was confined to shipping records and other information brought out in the testimony. He valued her at $63,611.94. His method was to make a deduction of a certain percentage from her original cost at the date of each of the periodical surveys which she underwent, so that when she passed her last survey, in 1897, these deductions amounted to 40% of her original cost; and finally, on ascertaining that the vessel had run in the iron ore trade in the last years of her existence, he took off 10% more, for the wear and tear which he considered incidental to this rough trade. He said that he ap-

proached the subject in the attitude of an intending purchaser, and valued the vessel at what he would have been willing to pay for her; his estimate had not been influenced in any way because of the fact that the United States was at war and was procuring vessels.

Mr. Clark was at one time a master mariner, but has been Lloyds' agent in New York for the past 8 years; he was in London from 1877 to 1890 as agent for New York and Boston Underwriters, and has also been chief surveyor to the Record of America and Foreign Shipping; he has had to do with the valuation of vessels in London and keeps posted about vessels in New York. He valued the vessel at £14,542.50 or $70,542.50. He had never seen her, but based his estimate on the surveys and data furnished him. He took the original cost of £23,000, which, with the repairs, renewals and other expenses amounting to £12,000, made a total of £35,000, which the owners had spent on the ship; but in the £12,000 there were a good many items which, although necessary, did not increase the intrinsic value of the ship, such as surveyors' fees and dry docking; for this reason he rejected 50% of the £12,000, reducing it to £6,000, which, deducted from £35,000, left £29,000; bearing in mind the high class of the vessel, and the fact that her earning capacity was not impaired (since she could earn as much money for her owners as a new ship of her size and type could) but considering that she was 19 years old, he thought it would be fair to strike off half of the amount expended on her, or £14,500; he was also mindful of the fact that in 1898 ship property was anywhere from 25 to 30% more valuable than at present; he also took into account the fact that she had her original boilers, but he found that they did not carry a very high pressure of steam, and for that reason they would probably outlast boilers carrying a higher pressure; they had evidently been kept in good repair, because they were surveyed every year by Lloyds' Register and still held their highest class as they had originally.

Mr. See has been a marine engineer and naval constructor for 40 years and has been connected with well known ship-building and steamship firms as superintending and constructing engineer, and from this, and other experience which he set forth, has become familiar with steamship construction and values, although he said he never had to do with the actual purchase or sale in the market of vessels like the Foscolia. He placed the market value at £10,500, 'or $52,500.' This was based on the surveys, her original cost and the amount spent on her upkeep. He did not figure on an annual depreciation, but a general depreciation, taking all the elements into consideration; the boilers showed a depreciation which reduced the working pressure from 60 to 80 lbs., and that should be considered in relation to the hull, also; the efficiency of the boilers would be impaired, and with the reduced pressure and a greater coal consumption she would go slower and it would take longer to make the voyage.

Mr. Congdon has had an experience as a marine surveyor, extending over a period of 45 years. Early in life he went through such training as was necessary to become certified as a shipwright and ship builder, afterwards was a Lloyds' surveyor at various ports in England for many years, and for 21 years was principal surveyor for Lloyds' Register in the United States. He has seen the Foscolia many times, and passed her on one of the surveys, which he thought was in 1895. He placed the market value at $52,500. He says that he worked out the percentage of depreciation up to the vessel's 13th year, at which time he considered her worth from $60,000 to $65,000, and added: 'Beyond that I think it is unsafe to go, because I don't think there is any scale, or any man's experience, that will place a percentage of depreciation, year by year, for any series of years over that time on comparatively old vessels. You have to fall back then on what is termed the market value, what a vessel would fetch if sold, by comparison with other vessels that have been sold.' He received circulars containing records of sales of vessels abroad, and it was by comparison with these and with vessels which he himself had valued that he determined the market value; he had also considered the condition of the freight market at the time and given the vessel the benefit of it; she was a fairly good cargo steamer but there was nothing special about her; in fixing the value, he had given her the advantage wherever he could, because she was old and not very marketable.

129 F.—15

Where there is such a wide difference among experienced appraisers, it is not unreasonable to assume that some of them were biased to a certain extent in favor of the parties calling them, and that their estimates were unconsciously influenced more or less by a desire to present a favorable case for their clients. But it will be seen that the lowest estimate of any witness for the owners is that of Mr. Garmey, $63,600, and that the highest given by a witness for the Government is that of Mr. Thompson, £11,000, or $53,531.50; a difference of some $10,000. I am satisfied that the fair market value lies somewhere between these two estimates. In the three years immediately preceding the loss of the Foscolia, Mr. Garmey had an experience in the actual purchase and sale of vessels, which I think gives his testimony a practical value beyond that of the other experts examined before me. He testified on cross-examinaton as follows:

'Q. Mr. Garmey, have you bought and sold iron vessels? A. Yes, sir.
'Q. Could you say, roughly, how many? A. Well, between 1895 and 1898, for one firm I bought 7, sold 9 and built 3, ranging from 3,000 tons to 6,000 tons dead-weight.'

Under all the circumstances, I think that $60,000 is a fair value for the Foscolia, and I accordingly allow that sum."

The exception upon which most stress was laid in the argument was the one relating to interest, as follows:

"Fourth. For that the Commissioner did not allow interest upon all the items of the libellants' damages at the rate of six per cent. from the 28th day of May, 1898."

It is contended that the disallowance of interest is unjust and excludes the libellants from a full recovery of the damages sustained. Such appears to be the fact. Without interest, the recovery is only partial but it is too well established to admit of argument that the Government is not liable for interest on damage claims in the absence of an express statutory provision or stipulation covering it. Bunton v. U. S. (C. C.) 62 Fed. 171; U. S. v. Sherman, 98 U. S. 565, 25 L. Ed. 235; Tillson v. U. S., 100 U. S. 43, 25 L. Ed. 543; Harvey v. U. S., 113 U. S. 243, 5 Sup. Ct. 465, 28 L. Ed. 987; Angarica v. Bayard, 127 U. S. 256, 8 Sup. Ct. 1156, 32 L. Ed. 159; U. S. v. North Carolina, 136 U. S. 211, 10 Sup. Ct. 920, 34 L. Ed. 336.

Formerly, Congress adjudicated upon private claims against the Government, through its Committees, but the great and increasing volume of claims necessitated some other method of providing for their investigation and the Court of Claims was established for such purpose—Act of February 24, 1855, c. 122 (10 Stat. 612)—but general authority was never granted to pass upon collision cases, as they sounded in tort, and special legislation remained necessary in each case of such character. St. Louis & Miss. Valley Transp. Co. v. U. S., 33 Ct. Cl. 251, 265. When Congress acted upon such claims, the Court of Claims was usually selected as its instrument to ascertain the facts and, in case of liability upon the part of the Government, to assess the damages. Interest, however, was expressly excluded. Rev. St. p. 200 [U. S. Comp. St. 1901, p. 747]:

"Sec. 1091. No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest."

The claimants here, while conceding that if the matter had been referred by Congress to the Court of Claims, interest would not be recoverable, urge that as it has been sent to an admiralty court, which ordinarily allows interest as part of the damages, interest should be granted. The question turns upon the intention of Congress. It would seem that under the authorities cited, interest is not allowable, unless expressly provided for, and there being a complete absence of any allusion to interest in the Act, under which the action has been tried here, it should not be granted. The Commissioner says in this connection:

"Libellants claim interest on the various sums allowed. The District Attorney insists that interest cannot be allowed, since the act under which the suit was brought did not expressly award interest in the event of recovery by libellants.

It is undoubtedly true that the sovereign cannot be sued without his consent, and that interest cannot be allowed against the United States where it has not manifested its consent that it should be awarded. The act by which Congress authorized this suit to be brought does not in express terms authorize the Court to award interest, but libellants' counsel contends that it does so by implication, inasmuch as it provides that the claim of the owners of the Foscolia be submitted to this Court 'under and in compliance with the rules of said court sitting as a court of admiralty,' and that if it should appear that the fault was with the Columbia, the court should determine the amounts to be paid to the owners of the ship and cargo 'in order to reimburse them for the losses so sustained.'

It is argued that the reference to the rules of admiralty may be either to the practice on the instance side of the court or to the procedure in prize causes, and that in either view interest should be allowed.

Were this a collision suit against an individual, there is little doubt that libellants would be entitled to interest under the settled practice in this court; and perhaps it would also be so if the procedure in prize causes were followed, although the only instance cited in which interest was allowed against the United States in a prize cause was the Paquete Habana, 189 U. S. 453 [23 Sup. Ct. 593, 47 L. Ed. 900], and there, as counsel states, the admission of the court that interest was allowable against the Government was only implied. In the other cases cited, the Government was not a party, and two out of the three captures were by privateers.

In regard to that portion of the Act which provides that the libellants shall be reimbursed for their losses, I agree with libellants' counsel that for losses which occurred six years ago, it cannot fairly be said that the libellants are reimbursed when they receive the bare principal without the least compensation for the loss of the use of their property or its value during that period; and I should allow interest for that reason, if I thought interest could be allowed against the United States under an Act which does not expressly award it.

Besides a number of decisions of the Supreme Court, the District Attorney quotes many expressions from opinions of the Attorney Generals and Comptrollers of the Treasury which he contends support his position. Some of the opinions of those officials undoubtedly go so far as to say that the award of interest must be express, that it is never given by construction under an Act of Congress, and it seems clear that the practice has long prevailed in the departments, of disallowing interest on claims presented for payment. I think that the Supreme Court has also gone to this extent. It is true that some of these cases (as in Tillson v. U. S., 100 U. S. 43 [25 L. Ed. 543]), are appeals from the Court of Claims, and that the subject of interest on claims prosecuted in that court has been regulated by an Act of Congress to the effect that no interest shall be allowed on any claim up to the time of the rendition of the judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest. Act March 3, 1863, c. 92, § 7, 12 Stat. 706 [U. S. Comp. St. 1901, p. 747]. But I am referred to no case in which the federal courts

have allowed interest against the United States by construction under an act of Congress, and I have been unable to find any and the Supreme Court has expressed its views in language so positive that in my opinion an allowance of interest under the act which permitted this suit would be unauthorized. In Angarica v. Bayard, 127 U. S. 251 [8 Sup. Ct. 1156, 32 L. Ed. 159], which was not an appeal from the Court of Claims, the court referred with approval to the long line of opinions rendered by the Attorney Generals against the allowance of interest, including those in which it was stated that interest cannot be allowed unless expressly granted by Act of Congress. The Court also said:

'The case, therefore, falls within the well settled principle, that the United States are not liable to pay interest on claims against them, in the absence of express statutory provision to that effect. It has been established, as a general rule, in the practice of the government, that interest is not allowed on claims against it, whether such claims originate in contract or in tort, and whether they arise in the ordinary business of administration or under private acts of relief, passed by Congress on special application. The only recognized exceptions are where the government stipulates to pay interest and where interest is given expressly by an act of Congress, either by the name of interest or by that of damages.'

I therefore disallow interest."

I consider that these views are sound and should not be disturbed.

Moreover, there is persuasive evidence that Congress intended to exclude the recovery of interest. While this matter was pending, another claim for the recovery of damages caused by collision with a Government vessel was introduced simultaneously in the Senate and House of Representatives. The Senate bill which especially provided for the recovery of interest and costs, was first passed. When the matter was taken up for consideration by the House Committee on Claims, a report was made as follows:

"56th Congress,          House of Representatives.          Report
1st Session.                                                      No. 723

The Brooklyn Ferry Company of New York.

March 20, 1900.—Committed to the Committee of the Whole House and ordered to be printed.

Mr. Otey, from the Committee on Claims, submitted the following
Report.
(To accompany H. R. 9499.)

The Committee on Claims, to whom was referred the bill (H. R. 9499) for the relief of the Brooklyn Ferry Company, of New York, report the same favorably, and recommend that the same do pass, with an amendment striking out the words 'with costs and interest', on page 2, line 5.

The claim, amounting to $12,188.04, arises out of a collision which occurred in the East River, New York, on the 1st day of August, 1899, between the ferryboat New York and the U. S. S. Dolphin, a little after 6 o'clock in the morning. The Dolphin was bound through the East River to Newport, R. I., and the ferryboat was proceeding from the foot of East Twenty-third street, Manhattan, to her Brooklyn slip, at the foot of Broadway. A serious collision between the vessels happened off about South Third street, Brooklyn. The ferry company alleges that faults on the part of the Dolphin caused the disaster in violating a New York law, which is recognized and enforced by the United States courts, requiring steam vessels navigating the East River, when not bound to any of the docks or landing places therein, to keep as near as possible in the center of the river, and not to be propelled in excess of a rate of speed of 8 miles an hour; also, in violating the United States laws for the prevention of collisions in not keeping a proper lookout on the forward part of the vessel, in not stopping and backing her engines when danger of collision became apparent, in not giving the proper signals with her steam whistle, and in not navigating in conformity with those she did give.

The action of the committee in reporting the bill favorably is regarded as consistent with the policy of Congress, heretofore manifested in extending relief to citizens suffering loss from alleged negligence of Government's agents in this class of cases by giving them an opportunity to establish their claims, if found to exist, in the United States courts, and as this collision happened within the limits of the jurisdiction conferred by law upon the United States district court for the eastern district of New York, and as that court has had a very large experience in dealing with cases of collision upon the water, it is deemed the proper forum for the determination of the questions of law and fact involved in this case. A further reason for conferring jurisdiction upon that court in this case is found in the legal residence of the claimant within the district. The policy of Congress to permit citizens having claims against the Government to sue in their own districts finds expression in section 2 of the act of March 3, 1887, entitled 'An act to provide for the bringing of suits against the Government of the United States.' "

After this report, the Senate bill was amended to conform to it, by striking out the provision for interest and costs, and a bill was passed by both houses, of which the following is a copy:

"56th Congress,
*1st Session.* H. R. 9499.

(Report No. 723.)

In the House of Representatives

March 12, 1900.

Mr. Fitzgerald, of New York, introduced the following bill; which was referred to the Committee on Claims and ordered to be printed.

March 20, 1900.

Reported with an amendment, committed to the Committee of the Whole House, and ordered to be printed.

(Omit the part struck through.)

A Bill

For the relief of the Brooklyn Ferry Company, of New York, owner of the steam ferryboat New York.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

That a claim against the United States of the Brooklyn Ferry Company, of New York, a corporation organized and existing under the laws of the State of New York, with its principal place of business in the borough of Brooklyn, city of New York, owner of the ferryboat New York, for damages caused by collision between the said ferryboat and the United States steamer Dolphin, in the East River, near Brooklyn, on the first day of August, eighteen hundred and ninety-nine, may be sued for by the said ferry company, in the United States district court for the eastern district of New York, sitting as a court of admiralty and acting under the rules governing such court, and said court shall have jurisdiction to hear and determine such a suit and to enter a judgment or decree for the amount of such damages, if any shall be found to be due, against the United States in favor of the said ferry company, upon the same principles and measure of liability, ~~with costs and interest~~ as in like cases in admiralty between private parties, and with the same rights of appeal.

Sec. 2. That such notice of the suit shall be given to the Attorney-General of the United States as may be provided by order of the said court, and it shall be the duty of the Attorney-General to cause the United States attorney in such district to appear for and defend the United States.

Sec. 3. That should damages be found to be due the said ferry company, the amount of a final decree therefor shall be paid out of any money in the United States Treasury not otherwise appropriated."

The matter under consideration covering the Columbia-Foscolia collision, was introduced in the Senate and House of Representatives before the one covering the Dolphin-New York collision but

was enacted into a law subsequently. The report of the Senate Committee on Claims was as follows:

"Calendar No. 112.

| 56th Congress, | Senate. | Report |
| 1st Session. | | No. 100. |

British Ship Foscolia.

January 17, 1900.—Ordered to be printed.

Mr. Warren, from the Committee on Claims, submitted the following Report.

(To accompany S. 189.)

The Committee on Claims, to whom was referred the bill (S. 189) for the relief of the owners of the British ship *Foscolia* and cargo, having carefully considered the same, submit the following report:

A similar bill to the one now under consideration was favorably reported by this committee last session and passed the Senate. The Senate bill was also favorably reported by the House Committee on Claims.

As the committee's report (Senate report No. 1625) made last session fully sets forth the facts in the case, your committee adopt said report as their report and recommend the passage of the bill.

The report is as follows:

The Committee on Claims, to whom was referred the bill (S. 5000) for the relief of the owners of the British ship *Foscolia* and cargo, beg leave to recommend the passage of the bill for the reasons set forth in the letter of the Secretary of the Navy and accompanying papers.

Navy Department, *Washington, January 11, 1899.*

Sir: In response to the committee's request, contained in its letter of the 9th instant, for the views and recommendation of the Department in regard to the Senate bill 5000, for the relief of the owners of the British ship *Foscolia* and cargo, I have the honor to state that on the 28th of May last, at 7.30 p. m., the U. S. S. *Columbia*, while engaged in patrol duty just outside the harbor of New York and about 12 miles southerly and easterly from the Fire Island light-ship, came into collision with the British merchant steamer *Foscolia*. The *Columbia* was not seriously injured, but the *Foscolia* suffered much damage and sunk nine hours after the collision. There was no loss of life, the officers and crew of the *Foscolia* being taken on board the *Columbia* and cared for and brought into port, but the *Foscolia* and her cargo were a total loss.

It appears from the finding of a naval board of inquiry, convened to investigate and report upon the circumstances attending the collision, that at the time it occurred and for an hour and a half previously a thick fog had prevailed; that the vessels were both running at reduced speed on account of the fog; that a proper lookout was kept on both vessels; that the *Foscolia* was exhibiting the usual lights and sounding the fog signal, but that the *Columbia* had all her lights screened and was sounding no fog signal. It also appears from the finding of the court that no fault is imputed to any of the officers or men on board the *Columbia*, and that, aside from the screening of lights and discontinuance of the sounding of fog signals, everything that could have been done by them to avoid the catastrophe and to minimize its consequences, when it became inevitable, was done.

The testimony adduced shows that the lookouts on each vessel sighted the other at about the same time, the two vessels being about 100 yards apart, and that the *Columbia* was so manœuvred that a glancing blow only was received from the *Foscolia*, and doubtless little injury would have been caused either vessel but for the fact that the bow of the merchant steamer was caught upon one of the projecting after sponsons of the cruiser.

Upon careful consideration of the facts reported by the naval court of inquiry, above mentioned, the Department is satisfied that there is at least reasonable ground for the contention advanced by the owners of the *Foscolia* that the collision might have been avoided had the *Columbia* shown the lights and sounded the fog signals usual under such conditions. The lights and

signals were, however. dispensed with by the *Columbia* on this occasion for the reason that the Spanish fleet under the command of Admiral Cervera had not at that time been located and the cruiser was then engaged in patrol duty in the vicinity of the most important ports of the country, New York and Phila-delphia, the points between which she was cruising being Fire Island light-ship and Delaware Breakwater, and that it was deemed essential to take ex-traordinary precautions, even to the extent of incurring some hazard, in guard-ing against possibilities which might have developed at any moment.

A collision with one of our war ships having occurred under such circum-stances when, for public reasons deemed sufficient to justify such action, our vessel was disregarding the rules of the road at sea, and a valuable merchant steamer and cargo belonging to a friendly power being destroyed, apparently without contributory negligence on the part of her officers and crew, it would seem proper that the losses incident thereto should not be allowed to rest upon the owners of a private vessel, but that such losses should, on the con-trary, be borne by the United States, provided, of course, that it shall be ju-dicially determined in the courts of the United States that the facts are as hereinbefore outlined.·

Entertaining these views, and inasmuch as it appears that the bill (S. 5000) provides simply for the submission of all matters of fact in the case to the United States district court for the southern district of New York, sitting as a court of admiralty, and for the payment of such amount only as may be adjudged to the claimants by decree of such court, the Department recommends the bill to the favorable consideration of the committee, section 2 of the bill, making provision for the prompt payment of the amount which the court may find to be due, being deemed proper in view of the fact of the foreign owner-ship of the vessel lost and the desirability of avoiding in such a case the delay which would result from a resubmission of the matter to Congress for the necessary appropriation.

In this connection I desire to state that, under date of the 21st of June last, this Department addressed letters to the Committees on Naval Affairs of the Senate and House of Representatives, respectively, recommending favorable action in the matter of the claim of the owners of the *Foscolia* and cargo.

The inclosures of your communication are herewith returned.

Very respectfully,                                    John D. Long, *Secretary.*
Hon. H. M. Teller,
    Chairman Senate Committee on Claims, United States Senate.

                            Navy Department, *Washington, June 20, 1898.*

Gentlemen: Complying with the request contained in your communication of the 14th instant, I transmit herewith a press copy of the findings of the court of inquiry which recently investigated the collision between the U. S. S. *Columbia* and the steamer *Foscolia*. The Department's action of this date upon the case is as follows:

'The findings of the foregoing court of inquiry are approved.

'With respect to the claim of the owners of the *Foscolia* for damages, the Department will request Congress to authorize the submission of such claim to the United States district court for the southern district of New York for determination.'

Very respectfully,                                    John D. Long, *Secretary.*
Messrs. Cowen, Wing, Putnam & Burlingham,
            *45 William Street, New York City.*

                                Finding.

On the evening of May 28, 1898, the U. S. S. *Columbia*, on patrol duty, was in latitude 40° 20' north, longitude 73° (?)' west, and about 12 miles southerly and easterly from Fire Island light-ship. At 7.30 p. m. the course was S. W. ¼ S., and her speed 6 knots per hour. A thick fog had prevailed since 7 p. m. and the *Columbia* had all her lights screened and was sounding no fog sig-nal. The British merchant steamer *Foscolia* was at the same time approach-ing on a course E. ½ S., at a speed which had been reduced to 7½ knots on account of the fog. At 7.38 p. m. the lookout on the *Columbia* and the man in the forward chains sighted the *Foscolia* on the starboard bow.

The officer of the deck of the *Columbia* sounded the steam whistle twice, put the helm to starboard, and signaled the engine room for full speed ahead. The commanding officer of the *Columbia*, coming quickly from the emergency cabin, repeated the order for full speed ahead and sounded the siren, the collision occurring at the same moment. When the *Foscolia* was sighted the two vessels were about 100 yards apart. She had her starboard, port, and masthead lights set, yet none of these were visible to the Columbia until after the *Foscolia's* hull was seen. This is accounted for by the fact that the fog was very dense and daylight had not yet entirely disappeared. The *Foscolia* sighted the *Columbia* at about the same time that she herself was seen. The *Foscolia's* engines were at once reversed and given full speed astern. Her helm was put hard aport for starboard, but the distance was so short that her headway was probably not stopped until the collision occurred. The *Foscolia* struck the *Columbia* at the aft sponson on the starboard side, her stem cutting into five compartments above the protective deck. A considerable portion of her stem was left in the *Columbia's* side.

Measures were promptly taken for the temporary repair of the damages to the *Columbia*, and two of the *Columbia's* boats were sent to the assistance of the *Foscolia*. The *Columbia* remained in the locality nine hours, until the *Foscolia* sank. There was no loss of life, the crew of the *Foscolia* being taken on board the *Columbia* and cared for and brought to port. The damages to the *Foscolia*, occurring through the collision, caused her to sink. The court finds that the fog whistle of the *Foscolia* had been sounded for upward of half an hour previous to the collision, and that the whistles were not heard on board the *Columbia* until after the vessel was sighted. The evidence shows conclusively that the captain, officers, and men of the *Columbia* were attentive to their duties previous to and at the time of the collision. The same is true of the master, officers, and men of the *Foscolia*.

### Opinion.

The court is of the opinion that when the two vessels sighted each other the distance between them was so small and their speed and relative positions were such that a collision was unavoidable. If the lights of the *Columbia* had been displayed it is impossible to state positively whether they would have been visible to the lookouts on the *Foscolia* before the *Columbia's* hull was in sight, but the court is of the opinion that the hull would have been first discovered. The opinion of the court is, therefore, that the absence of the *Columbia's* lights is not an element in the causes which produced the collision. Notwithstanding that the fog whistle on board the *Foscolia* was not heard on board the *Columbia*, the court is of the opinion that the *Columbia's* fog whistle might have been heard on board the *Foscolia* had it been sounded. The court cannot, however, express a positive opinion on the subject, owing to well-known instances of sound being diverted under certain atmospheric conditions.

The court having taken into consideration the instructions in the case of the loss or grounding of a ship of the Navy, as directed by the precept, did not consider it necessary to call all the officers and crew before it, because of the fact that there had been no loss or grounding of a navy vessel. Capt. James H. Sands, of the *Columbia*, had received positive orders from his superior officer in command of the northern patrol fleet to cruise without lights. The object of this order was to conceal the presence of his ship from the vessels of a nation with which the United States was at war. [See article 445 of the United States Navy Regulations.] Captain Sands directed fog signals to be suspended for the same purpose. The court is of the opinion that he was justified in so doing. The court is of the opinion that the collision between the *Columbia* and the *Foscolia* was, under the circumstances of war, in no respect due to the fault or negligence of any of the officers or members of the crew of the U. S. S. *Columbia*, and therefore it is of the opinion that no further proceedings should be had in the matter.

William P. McCann,
*Commodore, United States Navy, Retired, President.*
Douglas Roben,
*United States Navy, Retired, Judge-Advocate.*"

The following is a copy of the bill which was subsequently adopted by both houses ·

"56th Congress,                          S. 189.
  *1st Session.*                       (Report No. 739.)
                         In the House of Representatives.
                              February 22, 1900.
                      Referred to the Committee on Claims.
                              March 21, 1900.
       Committed to the Committee of the Whole House and ordered to be printed.
                                   An Act
       For the relief of the owners of the British ship Foscolia and cargo.
       *Be it enacted by the Senate and House of Representatives of the United
       States of America in Congress assembled,*
       That the claim of the owners of the British steamship Foscolia, sunk by
collision with the United States steamship Columbia on the evening of May
twenty-eighth, eighteen hundred and ninety-eight, near Fire Island light-ship,
for and on account of the loss of said vessel and cargo, may be submitted to
the United States district court for the southern district of New York, under
and in compliance with the rules of said court sitting as a court of admiralty;
and said court shall have jurisdiction to hear and determine and to render
judgment thereupon:  Provided, however, That the investigation of said claim
shall be made upon the following basis:  First, the said court shall find the
facts attending the loss of the said steamship Foscolia and her cargo; and sec-
ond, if it shall appear that the responsibility therefor rests with the United
States steamship Columbia, the court shall then ascertain and determine the
amounts which should be paid to the owners respectively, of the Foscolia and
her cargo, in order to reimburse them for the losses so sustained, and shall
render a decree accordingly:  *Provided further,* That the amounts of the
losses sustained by the master, officers, and crew of the Foscolia may be in-
cluded in such decree.
       Sec. 2. That should such decree be rendered in favor of the owners of the
Foscolia and her cargo, the amount thereof may be paid out of any money in
the Treasury and not otherwise appropriated."

It will be seen that when the provision for interest and costs is stricken out of the Dolphin-New York bill, there is no · material difference between the two bills with respect to interest.  Under such circumstances, it is not perceivable how interest can be allowed on the Foscolia losses, even though it is apparent to the court that strict justice can not be achieved in any other way.  It certainly was not the intention of Congress to allow interest to foreign own-ers, when refused to citizens of this country under somewhat simi-lar circumstances.

The exceptions are overruled.

[The decision on the merits in this action will be found in 123 Fed. 105.]