## THE VIRGINIA.

## NATIONAL BULK CARRIERS, Inc. v. UNITED STATES.

No. 1567.

District Court, D. Delaware.

Sept. 12, 1947.

Leonard J. Matteson and Julian S. Gravely, Jr. (of Bigham, Englar, Jones & Houston), and Samuel D. Antopol, all of New York City, and Abel Klaw, of Wilmington, Del., for libellant.

J. Frank Staley, Sp. Asst. to the Atty. Gen., Jess H. Rosenberg, Atty., Dept. of Justice, and Benjamin H. Berman, Atty., War Shipping Administration, both of Washington, D. C., and John J. Morris, Jr., U. S. Atty., of Wilmington, Del., for the U. S.

Daniel F. Wolcott (of Southerland, Berl & Potter), of Wilmington, Del., special commissioner.

LEAHY, District Judge.

The Court appointed Daniel F. Wolcott, Esquire, as a Special Commissioner to report his findings of fact and conclusions of law and the amount of award to which libellant is entitled.[1] The Commissioner made a comprehensive report. It follows.

WOLCOTT, Special Commissioner.

I. Introductory

This suit is for the recovery of the value of the Steam Tank Vessel, "Virginia" owned by National Bulk Carriers, Inc., the libellant. On April 20, 1942, under author-

---

[1] For factual background, see this Court's opinion in National Bulk r- riers v. United States, D.C.Del., 5ti F. Supp. 765, affirmed United States v. Leahy, 3 Cir., 148 F.2d 462.

ity of Section 902 of the Merchant Marine Act of 1936 as amended, 46 U.S.C.A. § 1242, the respondent requisitioned the "Virginia" on a time-charter basis. Delivery of the ship was accepted by the respondent on that date. Under one of the terms of the charter subsequently executed by the parties, the respondent agreed to provide or assume war risk insurance on the "Virginia", and eventually delivered to the libellant a war risk binder insuring the "Virginia" against loss or damage by war risk from the time of delivery to the termination of the charter. The amount of war risk insurance required to be placed on the "Virginia" was provided to be "just compensation to be determined in accordance with Section 902 of the Merchant Marine Act of 1936 as amended" in the event of the total loss of the "Virginia". Similarly, the war risk binder delivered to libellant by respondent defines the amount of hull insurance on the "Virginia" as "just compensation Option II" of the charter.

On May 12, 1942 the "Virginia" became a known total loss at sea due to enemy action. Thereafter, negotiations went on between the parties seeking, by agreement, to determine the value of the "Virginia". These negotiations having failed, the libellant filed its libel seeking to recover the value of the "Virginia" from the respondent.

The respondent excepted to the libel alleging, inter alia, that libellant having elected under the charter war risk insurance valuation Option II providing for just compensation to be determined in accordance with Section 902 of the Merchant Marine Act, therefore, elected to pursue the remedies given by that Act. Upon this premise, the respondent argued this court was without jurisdiction. This exception was overruled and subsequently that ruling affirmed in proceedings for a Writ of Prohibition in the Circuit Court of Appeals for this circuit.

This court has held, therefore, that the effect of Option II of the time charter and of the war risk insurance binder was to set up by agreement of the parties a valuation formula for determining the value of the "Virginia", that formula being just compensation to be determined in accordance with Section 902 of the Merchant Marine Act of 1936 as amended.

On February 15, 1946, an order of reference was entered referring the case to a Special Commissioner "to ascertain and compute the amount which the libellant is entitled to recover in the above-entitled suit."

By stipulation between the parties, all questions of damage other than the loss of the "Virginia", itself, have been settled by the parties. The sole remaining question, therefore, is the amount to be paid by the respondent to the libellant as just compensation for the total loss of the "Virginia" while under charter by the respondent.

On or about July 15, 1943, the sum of $1,265,609.88 was paid to the libellant on account of the total loss of the "Virginia" from war risks.

## II. Proceedings before the Special Commissioner

Pursuant to notice given by the Special Commissioner to counsel for the libellant and respondent, the hearing was commenced in the Federal Building, Wilmington, Delaware, at 10:00 o'clock a. m. on May 6, 1946. At the first meeting it was determined by agreement of all concerned that the sole case to be heard and determined in the present proceedings is that of the Steamship "Virginia", No. 1567 in Admiralty. The case of the "William C. McTarnahan" included in the order of reference, No. 1568 in Admiralty, by agreement of counsel, is to be heard at a later time. At various intervals hearings were resumed before the Special Commissioner, to wit, May 7, 1946; May 13, 1946; May 14, 1946; May 15, 1946; June 10, 1946; June 11, 1946; June 13, 1946; June 14, 1946; June 18, 1946. At the adjournment of the hearing on June 18, 1946, argument was set for July 17, 1946 and later continued to July 24, 1946. On that date the case was argued before the Special Commissioner on oral argument and briefs.

The stenographic minutes of the hearings, exhibits for both the libellant and respondent, and briefs of counsel are submitted herewith.

At the close of the argument on July 24, 1946, at the request of counsel, the Special Commissioner relieved them of the necessity, at that time, of submitting proposed recommendations of Findings of Fact and Conclusions of Law upon the assurance of counsel that, after the filing of a preliminary report by the Special Commissioner disposing of certain basic issues in controversy, counsel for both sides would submit their proposals for Findings of Fact and Conclusions of Law to be recommended by the Special Commissioner for adoption by the court. It is proposed, therefore, to follow this report with a supplemental report embodying recommendations for Findings of Fact and Conclusions of Law to be adopted by the court.

### III. The Basis on which Damages are to be Awarded

As pointed out in the introductory statement, the problem before the Special Commissioner is the application of a valuation formula agreed to by the parties. This formula is just compensation under Section 902 of the Merchant Marine Act of 1936 as amended, 46 U.S.C.A. § 1242 (a), the pertinent provision of which is as follows: "When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use.".

■ The amount of damages to be awarded in this case is, therefore, whatever sum would be considered "just compensation" for the "Virginia" as though, at the time of the total loss of the "Virginia" by enemy action, the "Virginia" had been requisitioned as to title by the War Shipping Administration.

### IV. The Measure of Damages

■ It seems well settled that the meaning of the phrase, "just compensation", in Section 902 of the Merchant Marine Act of 1936 as amended, is the same as the phrase "just compensation" used in the Fifth Amendment of the Constitution of the United States, and is subject to the general principles announced by the courts in awarding just compensation under the Fifth Amendment of the Constitution.

The case of Brooks-Scanlon Corporation. v. United States, 265 U.S. 106, 44 S.Ct. 471, 474, 68 L.Ed. 934, is a leading case on the subject of the measure of damages resulting from the requisition of vessels by the United States. In that case, the Supreme Court was called upon to determine the meaning of the phrase, "just compensation", and did so in the following language: "It is settled by the decisions of this court that just compensation is the value of the property taken at the time of the taking. (Citing cases)."

■ The measure of damages is further defined in this case in terms which make it quite clear that the measure to be applied is the "market value" of the property at the time of its requisition. Thus, the court said in speaking of the amount to be awarded: "It is the sum which, considering all the circumstances—uncertainties of the war and the rest—probably could have been obtained for an assignment of the contract and claimant's rights thereunder; that is, the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy."

The Brooks-Scanlon case applies a measure of damages that has apparently never been seriously questioned. In Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 708, 78 L.Ed. 1236, the Supreme Court in determining the just compensation for the taking of property by the United States said: "That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. * * * It may be more or less than the owner's investment. He may have acquired the property for less than its worth or he may have paid a speculative and exorbitant price. Its value may have changed substantially while held by him. The return yielded may have been greater or less than interest, taxes, and other carrying charges. The public may not by any other means confiscate the benefits, or be required to bear the burden, of the owner's bargain. * * * He is entitled to be put in as good a position pecuniarily as if his property had not been

taken. He must be made whole but is not entitled to more. It is the property and not the cost of it that is safeguarded by state and Federal Constitutions. * * *."

In Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890, the Supreme Court in determining the value of a vessel lost as a result of tortious collision said: "It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed. In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. * * * Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. * * *"

It would serve little purpose to further catalogue the decisions of the Supreme Court and lesser Federal Courts which have adopted "market value" as the measure of damages for the total loss or requisition of a vessel. Suffice it to say that I am satisfied that that measure of damages is the proper one to be applied in this case.

That measure of damages is the measure urged by the libellant. The respondent, on the other hand, contends that it cannot be applied in this case. No decision has been called to my attention, however, which, in any way, departs from or limits the measure of damages set forth in the Brooks-Scanlon and other above cited cases. The respondent urges that there can be no market value for the "Virginia" or, apparently, for any ship, due to the fact that no one ship is precisely like another. I am unable to agree with this argument. The respond-

ent's argument seems to be based upon what it says is "the utter impossibility, under almost any conceivable circumstances, of the existence of a true 'market' and of a fixed 'market' price for property in the nature of a large vessel". (Respondent's main brief, page 11). It can, of course, be conceded that a ship differs from a standard commodity such as wheat, corn, or coal and cannot, therefore, have a "market value" based upon some standard unit. This is very different, however, from saying that, because of the inherent nature of the property, it can have no "market value".

This argument flies in the face of a long line of cases determining the value of ships of various types in terms of their "market value". In my opinion, a ship can have a "market value" even though that value is not subject to daily quotation on some exchange. The "market value" of a ship, it must be remembered, is not determined by daily quotation as to the price of dead weight tons, or some similar criterion, but in the sum which a willing buyer would have paid a willing seller for the ship. To some extent, that sum must be an opinion based on available evidence.

It is unnecessary to review specifically the cases cited by the respondent in support of its argument since all of them stand for no more favorable position to the respondent than that a ship does not have a "market value" similar to that of a bushel of wheat or a pound of butter. This is far from saying that under no circumstances can a ship have a "market value".

As a matter of fact, many factors may be used by courts to determine what that market value is in the absence of any definite market established by comparable sales of vessels of a similar type. Thus, in Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, at page 155, 45 S.Ct. 465, at page 467, 69 L.Ed. 890, the Supreme Court said: "It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed. In case of total loss of a vessel, the measure of damages

is its market value, if it has a market value, at the time of destruction. * * * Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. * * And by numerous decisions of this court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value. * * The same rule is applied in England. * * It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. * * *"

■ The measure of damages, therefore, to be applied by the Commissioner is the "market value" of the "Virginia" as of May 12, 1942. In determining what that amount is sales of comparable vessels at or near the date of loss shall be resorted to if there were such sales. If there were no sales of like ships, then other evidence may be resorted to to determine what was the "market value" of the "Virginia" at the time of her loss. This other evidence, however, is not a limiting measure or guide but is something to be used to determine what the price would have been in the event of a sale of the "Virginia" resulting from fair negotiations between an owner willing to sell and a purchaser desiring to buy on May 12, 1942.

The respondent argues that the procedure outlined above is speculative and not capable of definite determination. If this is true, then the answer must be that all awards of damages which are based at all upon opinion are speculative. I consider this not to be a serious objection to the method of procedure. As the Supreme Court said in the Standard Oil case supra, the ascertainment of value "is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts".

### V. The Sales of T2s as Establishing a Market

The basis for the libellant's valuation of the "Virginia" as of May 12, 1942 is a series of sales of T2-SE-A1 and T3-S-A1 type tankers by the Maritime Commission to various private purchasers at or about the date of loss of the "Virginia".[2] Using these sales as a basis, the libellant's expert witnesses testified as to the value of the "Virginia". The various sales adverted to are listed in libellant's Exhibit 13(a) which shows the names of the vessels sold, their purchasers, the dates of delivery, the sales prices tentatively agreed upon at the time of delivery, the dead weight tonnages and speeds according to General Order 10 and supplements, and the War Shipping Administration monthly charter hire for the vessels sold. All of the vessels so sold were requisitioned by the War Shipping Administration on a time-charter basis.

It is the contention of the libellant that these transactions constitute sales, in a legal sense, of the vessels by the Maritime Commission to various private purchasers. Therefore, according to libellant's theory, the sales listed in Exhibit 13(a) constitute a market of vessels which are comparable in size, speed and performance to the "Virginia", and from which the market value of the "Virginia", itself, can be deduced.

On the other hand, the respondent contends that the transactions between the Maritime Commission and the various private concerns listed in libellant's Exhibit 13(a) are not, in a legal sense, sales which can be said to constitute a market, and also that, in any event, the T2 and T3

[2] For convenience, the T2-SE-A1 and T3-S-A1 type tankers will hereinafter be referred to respectively as T2 and T3.

type of tanker is not sufficiently comparable to the "Virginia" to permit their sales prices to be used in determining the market value of the "Virginia".

Respondent objected to the admission of Exhibit 13(a) in evidence on these grounds. Exhibit 13(a) was admitted subject to a ruling on respondent's objection. For reasons which will be apparent later on in this report, I overrule respondent's objection, repeated many times at the hearing, to the admission of Exhibit 13(a) in evidence.

The question of comparability of the "Virginia" and the T2 type tanker will be discussed in a later section of this report. This section of the report deals solely with the question of whether or not the transactions listed in libellant's Exhibit 13(a) are sufficient in fact to constitute a market from which the value of comparable vessels can be determined.

The transactions listed in this Exhibit show sales in 1942 of fourteen T2 type tankers, two of which were sold prior to May 12, 1942. These fourteen tankers were sold to seven different private purchasers including four companies engaged in independent transportation of petroleum cargo in bulk and competitors of the libellant.

For the first six months of 1943, nine additional T2 type tankers were sold to private owners and an additional nine sold during the last six months of 1943 to make a total of thirty-two T2 type tankers sold by the Maritime Commission in 1942 and 1943.

In 1943, during the first six months, three of the T3 type tankers were sold and during the last six months of 1943, four of this type were sold, to make a total of seven of the T3 type tanker sold by the Maritime Commission to private purchasers.

Arthur E. Dietze, a witness for the libellant and a ships broker with extensive and lengthy experience in the sale of ships of various types, who kept himself abreast of all sales of ships under the American flag, testified that, in the ten years prior to the war, not more than thirty tankers had been sold and purchased by private owners.

It is apparent, therefore, that the number of transactions represented on libellant's Exhibit 13(a) with respect to the T2 type tanker is extremely favorable in comparison to the total number of sales for a period of ten years prior to the war. In addition to this, William R. Bagger, a witness for the libellant who is a consultant engineer, surveyor and appraiser of ships, testified that twenty-three sales of T2 type tankers over a period of one year and four months are sufficient to constitute a market. All of libellant's witnesses who testified as to the value of the "Virginia" concur in Mr. Bagger's opinion. On the other hand, respondent has not offered substantial contradiction to the testimony thus adduced on behalf of libellant. I conclude, therefore, that the number of transactions listed on libellant's Exhibit 13(a) is sufficient to constitute a market of the T2 type tanker.[3]

In order to create a market in addition to a sufficient number of transactions, it must appear that they were sales between a willing seller and a willing buyer. If this element is present, then the price thus arrived at, taken in conjunction with the number of transactions over the period, together create a market in the sense that from it can be gauged the value of similar ships. Respondent contends strenously that the sales of T2 type tankers by the Maritime Commission lack the willing seller-buyer element.

In order to test the persuasiveness of the respondent's argument, it will be necessary to inquire into the nature of the various transactions. The testimony of Arthur A. Fisher, a witness on behalf of the respondent and an employee of the Maritime Commission, is very clear as to the nature of these transactions. From his testimony it

3 The spread of the sales over part of 1942 and 1943 does not appear to make any material difference since conditions were comparable throughout the entire period. There is testimony in the record that the market value of ships remained about the same throughout 1942 and 1943. This is further borne out by Exhibit 13(a) through a comparison of the various sales prices listed.

appears that all of the vessels listed on libellant's Exhibit 13(a) were sold under the provisions of the Merchant Marine Act of 1936. All of the transactions were initiated by an application by the purchaser to the Maritime Commission for aid in the construction of a new vessel. If the application was approved by the Commission, the applicant received the title to the vessel upon payment of the cost of the construction, less cost of national defense features, plus interest at the rate of 3½% on the Maritime Commission's outlay of cash in aiding the cost of construction.

Mr. Fisher, however, also testified that all of the facilities of all the yards in the country had been contracted for by the Maritime Commission prior to the receipt of any application by a private concern for aid in the construction of new tankers and that, if an applicant applied for construction aid, what in fact occurred was that the Maritime Commission merely assigned to the purchaser one of its contracts for the construction of a tanker by a yard chosen by the applicant.

Mr. Fisher further testified that the "sales price as per preferred mortgage" set forth in libellant's Exhibit 13(a) represented the purchase price for the completed vessel which, under Section 509 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1159, necessarily had to be paid in a certain manner, to wit, a down payment of 12½% of the construction cost of the vessel with the balance covered by a preferred mortgage. He also testified that the purchase price was the tentative construction cost of the vessel which might, at a later time, be adjusted either up or down. On cross-examination, Mr. Fisher testified that the payment provisions of the Merchant Marine Act were mandatory and that, even if a purchaser had so desired, he would not have been permitted to pay in cash 100% of the purchase price. He also testified that the Maritime Commission had no authority to sell any of the vessels listed in libellant's Exhibit 13(a), except under the provisions of Section 509 of the Merchant Marine Act of 1936. In order, therefore, to affect a transfer of title and sale of the vessels to the private owners, Section 509 was utilized even though the construction of the various vessels sold had been instigated by the Government.

It seems indisputable that what actually occurred was that when the shipping emergency arose, the Maritime Commission immediately contracted for all the available shipyard facilities for the construction of tankers so effectively as to preclude private operators from contracting for the construction of tankers. Necessarily, therefore, these operators had to come to the Maritime Commission if they desired to obtain new tank vessels. When the private owners, however, applied to the Maritime Commission for the purchase of these vessels, an obstacle arose in that the Maritime Commission had no authority to sell in a normal fashion the ships thus being constructed. Therefore, what amounts to legal shadow-boxing occurred. In order to comply with the provisions of Section 509 of the Merchant Marine Act, the prospective purchaser was forced to apply for aid in the construction of the vessel he was about to purchase even though, in some instances, the vessels had already been launched. This formality having been gone through, the price was then set, viz., the tentative estimated cost of construction less the national defense features, plus 3½%, and that amount was applied for, theoretically in aid of construction of the vessel.

Despite all the legal smoke screen thus set up, in my opinion, the transaction amounted to nothing more nor less than a sale of the vessel to the purchaser as of the date of delivery of the vessel. To be sure, the price was tentative and could vary either up or down as later estimates of cost might dictate, but nevertheless a sale had taken place.

The conclusion to be reached, then, is that there were sufficient sales of the T2 type tanker within a sufficiently limited period to constitute a market of this type of tank vessel. I think it can reasonably be said, also, that these sales were entered into by a party willing to sell and a party willing to buy.

The respondent has made much of the fact that the purchase price is arrived at by an estimate of the cost of construction. This, according to respondent's counsel, de-

stroys the hypothetical willing seller. This may be true, but in no sense can it be said to destroy the existence of the hypothetical willing buyer. The conclusion is inescapable that the purchasers of these vessels were willing at the time the sales were made to pay for the vessels the figures set opposite the vessels' names in libellant's Exhibit 13(a). It is immaterial that, at a later date, that price might be reduced. At the time the sale was consummated, they legally obligated themselves to pay that much and that, I think, satisfies the requirement of the hypothetical willing buyer purchasing in the only market available to him. If, as the respondent says, there was no competition in these sales, then the effect of that is to reduce the price that would have been paid by a willing buyer if the seller had been motivated by a desire to make a profit on his investment. I conclude, therefore, that the prices set forth in libellant's Exhibit 13(a) represent, if not the maximum, then certainly the minimum price that would have been paid for a T2 type tanker on the date of delivery of the particular vessel to the purchaser.

### VI· Comparison of T2 Type Tankers and the "Virginia"

It has been established that the sales of T2 type tankers listed in libellant's Exhibit 13(a) constitute a market. This market then may be used as a basis for valuation of the "Virginia" if the "Virginia" and T2 type tankers are comparable. The basis of one of the respondent's objections to Exhibit 13(a) is that, in point of fact, the "Virginia" and the T2 type were so dissimilar that no comparison could be made between the two, and that the value of one could, under no circumstances, have any bearing on the value of the other. The libellant, on the other hand, argues that, in point of fact, the T2 type and the "Virginia" are similar and comparable but that the "Virginia" is superior both in design and economy of operation. Because, however, of their similarity, libellant's witnesses testified that, using the market value of the T2 as a basis, the market value of the "Virginia" could be computed. [4]

For the purpose of comparison, the following statistics are set forth:

| | "Virginia" | T2 Type |
|---|---|---|
| Length over-all | 515'-11" | 523'-6" |
| Length between perpendiculars | 500' | 503' |
| Beam | 70' | 68' |
| Depth | 38'-6" | 39'-3" |
| Draft | 30'-11" | 30'-2" |
| Displacement light | 4420 tons | 5110 tons |
| Displacement loaded | 23,220 tons | 21,880 tons |
| Dead weight | 18,800 tons | 16,770 tons |
| Tank capacity | 157,802 barrels | 141,158 barrels |
| Engine | Turbo-gear | Turbo-electric |
| Normal S.H.P. | 8500 | 6000 |
| Maximum continuous S.H.P. | 9430 | 6600 |
| Speed—G.O. 10 | 15.7 Knots | 14.6 Knots |
| American Bureau Classification | *A1(E) | *A1(E) |

From the foregoing statistics, certain obvious differences are apparent. For example, the speed of the "Virginia" is approximately 1.1 knots better than that of the T2. It is also apparent that the "Virginia" is a lighter ship than the T2 by some 690 tons. It is also apparent that the dead weight of the "Virginia" is some 2,030 tons in excess of that of the T2. A further major distinction is that the "Virginia" is a turbo-gear driven ship while the T2 is a turbo-electric driven ship.

On the other hand, certain obvious similarities are apparent. Both vessels are approximately the same in their hull dimensions, which is rather amazing since the "Virginia" was able to carry approximately 12½% more cargo than the T2 within the same approximate hull dimensions, and this at a greater speed than the T2. In addition to this, both vessels had been classed *A1(E) by the American Bureau of Shipping, and both were near the minimum standards required by that Bureau. This classification roughly indicates that both vessels were of equal strength and seaworthiness.

---

[4] The libellant's witnesses, with the exception of Mr. Bagger, have based their opinion of the market value of the "Virginia" largely on the basis of the value of the T2. At the hearing the comparison of the "Virginia" was made largely to the T2. Furthermore, there are only a total of seven sales of the T3 type listed on Exhibit 13(a). For these reasons, the T3 type will be ignored in determining the question of market value of the "Virginia".

Mr. Bagger testified that the "Virginia" and the T2 type tanker were sufficiently similar in their general design and purposes for which they were to be used to permit the valuation of the "Virginia" on the basis of the market value of the T2 type. The similar characteristics of each type which, for this purpose, made the vessels comparable, are that (a) both vessels were designed for the same trade, viz., the carrying of liquid cargoes, (b) both are of the same general type with two longitudinal bulkheads, (c) both have a buoyancy space or deep tank forward separated from the cargo tanks by a cofferdam, and (d) from the cofferdam the cargo tanks run aft to the space allocated to the machinery and crew. All of these items, Mr. Bagger testified, make both conform to the usual general tanker design.

The testimony of Mr. Bagger in this respect is corroborated by Mr. Martin, Mr. Dietze and Mr. Haight, all witnesses for the libellant.

The respondent, on the other hand, insists that the T2 and the "Virginia" type of tanker are too dissimilar to permit comparison for purposes of value, admitting, however, that insofar as strength of hull and machinery are concerned the types are about equal (Respondent's Main Brief p. 34). The respondent had its witnesses testify at length concerning the differences between the two types, which differences, it is argued, destroy the comparability of the types. For convenience, some of the major differences testified to are listed below:

| | "Virginia" | T2 Type |
|---|---|---|
| Dry Cargo Space | Absent | Present |
| Dry Cargo Booms, etc. | Absent | Present |
| Heating Coils | Absent | Present |
| Vent System | Individual to tanks | Closed |
| Bulkhead in Engine Room | Absent | Present |
| Access to Cargo Tanks | Ladders | Stairways |
| Stack | Single | Double |
| Catwalk fwd. | Absent | Present |
| Extended Poop | Present | Absent |
| Propulsion Machinery | Gear Turbine | Turbo-electric |

In addition to the foregoing differences, there was extensive testimony by the respondent's witnesses concerning the superiority of the crew accommodations of the T2 type over the accommodations of the "Virginia". Little would be gained by a detailed analysis of these differences. It may be conceded that the respondent is correct in saying that the crew accommodations of the T2 are superior. Nevertheless, the fact remains that the quarters and accommodations of the "Virginia" are adequate for the purpose, and have enabled the libellant to obtain crews for the sister ships of the "Virginia". As a matter of fact, it seems to me that the difference between the quarters and accommodations of the two types is largely one of arrangement and appearance. They both are adequate for the purpose for which they are designed.

It follows, then, that the major differences between the two types are those set forth in the foregoing list. I shall comment briefly on each.

The absence of a dry cargo space and dry cargo handling gear in the "Virginia" is non-essential to the operation of an independent carrier of liquid cargoes. It may be true that provision for the carrying of dry cargo in a tanker is desirable from the point of view of a refining company which has to supply overseas plants, but even this is rather doubtful since Mr. Watts, Vice-President of Sinclair Oil Corporation of New York, a company which surely falls within that category, testified that he would have purchased the "Virginia" for his company in the Spring of 1942 if she had been available and for sale.

The absence of a closed system of venting the cargo tanks in the "Virginia" simply means that the "Virginia" could not transport Grade A petroleum cargoes. Grade A cargoes, however, constitute only a fraction of one percent of the total of waterborne petroleum products. It is undisputed that the libellant, during the years it has been in business, has never been offered such a cargo for transportation. I conclude, therefore, that the absence of a closed vent system in the "Virginia", and its presence in the T2 is not a difference materially affecting the comparability of the two ships. It does not appear that, with the exception of Grade A cargoes, the closed vent system has any additional safety advantages over the individual tank

venting system employed on the "Virginia". It is suggested, however, by some testimony that the closed vent system creates a hazard in facilitating the building up of pressure on the tanks.

The fact that there were no heating coils installed in the "Virginia" was made much of by the respondent. It is not disputed, however, that if desired, heating coils could have been installed in the "Virginia" at a cost varying in estimate from $27,000 to $60,000. Furthermore, it appears that libellant has operated at a profit the ships of the "Virginia" class without heating coils. This fact alone goes a long way toward destroying the respondent's argument that the presence of heating coils makes the T2 a more desirable vessel. I do not believe the absence of the coils on the "Virginia" destroys the comparability of the types.

The provision for an additional bulkhead in the engine room of the T2 was a measure dictated by the necessities of war time operation, designed to give additional buoyancy aft in the event of damage. It is not necessary in peace time operation and, in fact, might operate as a detriment to efficient engine room operation since it places the main engines and boilers in separate compartments.

Much has been said concerning the fact that the T2 has stairways giving access to the cargo tanks while the "Virginia" has vertical ladders. It is argued, on behalf of the respondent, that the vertical ladders constitute a hazard to the safety of the crew. Access to the cargo tanks, however, is needed only in port and at infrequent intervals. It does not appear that the libellant's experience has been any abnormal number of accidents attributable to entering the cargo tanks. The fact that a man must descend a vertical ladder 30 or 40 feet rather than a stairway would, it seems to me, produce an added measure of caution on his part.

The fact that the T2 has a double stack and a catwalk forward from the bridge to the forepeak does not, in my opinion, materially affect the comparability of the two types of vessels. These two items are largely a matter of personal perference. In the case of the double stack, it, as far as I can see, does little beyond adding to the symmetry of the ship. In the case of the catwalk forward, it is largely a matter of convenience since no member of the crew ordinarily has duties on the bow during heavy weather. Furthermore, it is admitted by both sides that during heavy weather solid seas are breaking over the bow of any tanker if she is fully loaded. The catwalk forward under such conditions would be of no use.

There was considerable testimony concerning the merits of the gear turbine type of propulsion machinery as opposed to the turbo-electric. There seems to be a decided difference of opinion among the experts, themselves, as to this. It does appear to be conceded by both sides, however, that the gear turbine is the simpler and less costly of the two. In any event, I do not believe that the difference is so serious that the two types of vessels can be said to be in no sense comparable because of it.

The "Virginia" has a poop deck extended forward as far as the bridge. This deck on the T2 is ended well aft of the bridge which is connected to it by an after catwalk. The purpose of the extended poop on the "Virginia" is twofold; (1) to take the place of the after catwalk and to permit deeper cargo tanks in this section of the hull. The deeper cargo tanks permit the carrying of more cargo and also correct a common tanker tendency to trim down at the bow when fully loaded. The extension of the poop forward on the "Virginia" would appear to be the only real departure from standard tanker design. While it is a difference from the T2, I believe it does not make the two types so different as to preclude comparison. There is no serious suggestion that her extended poop made the "Virginia" less strong or seaworthy. As a matter of fact, to the extended poop may be attributed the increased carrying capacity of the "Virginia", directly because of the increased depth of the cargo tanks below the poop deck, and indirectly because the increased weight aft in those tanks permitted the carrying of liquid cargo farther forward. In my opinion, therefore, the only significance of the extended

poop of the "Virginia" is to increase the value of the "Virginia" over the T2, since all value must be determined by the amount of cargo that can be carried.

The important thing in an inquiry of this sort is not to inquire as to the number of bitts or fair-leads one ship has as compared to the other, but is to ask whether or not the two ships are of a fairly relative size and speed, and whether or not they are engaged, or could be engaged, in the same carrying trade. If these inquiries are answered favorably, then the value of one can be determined from the value of the other by the application of the proper corrective factors. What these corrective factors may be is a proper matter for expert appraisers to determine from their experience.

In the comparison sought to be made by the libellant, we have two ships of approximately the same hull dimensions, one of which can carry 2,030 more tons of cargo at 1.1 knots more speed, while having an actual weight of 690 tons less. This strikes me as a remarkable achievement to be explained only by a more efficient design. There is no serious suggestion that the seaworthiness of the T2 is better than the "Virginia"; in fact, they are conceded by both sides to be approximately equal in this respect. In everything but carrying capacity and speed the ships are substantially similar, except for the items absent on the "Virginia" which make up her 690 tons less light weight. If the "Virginia" carried only 690 tons more cargo than the T2 there could then be no question of design, but in fact, the "Virginia" carries in addition to this 690 tons of cargo, 1,340 tons of cargo more than the T2 and this amount is solely attributable to the differences in design.

The differences in design between the T2 and the "Virginia", however, are not radical differences, that is, the "Virginia" does not depart radically from standard tanker design. The difference lies in an adaptation of the standard design to eliminate waste weight and increase the cargo carrying capacity. This adaptation has not been made at the expense of seaworthiness. The result has been that within the same approximate hull dimensions the designers of the "Virginia" produced a 20% more effective vessel from an earnings standpoint, which are directly proportionate to the amount of cargo delivered.

It does not appeal to me to argue as the respondent has argued that because one of two ships of approximately the same size, which can deliver over the course of a year approximately 20% more payload is, nevertheless, worth less on the market than the ship which can earn a gross income of only 80% as much. It seems to me that this fact alone destroys the respondent's argument. In the last analysis the value of commercial ships must be some figure which represents their earning capacity. The argument of respondent that the "Virginia" is worth less than the T2 would be more persuasive if their carrying capacities and speeds were reversed.

The fact that the "Virginia" may have cost less than the T2 to build seems of no importance to me. Whatever the cost to the libellant may have been, it is entitled to the amount the "Virginia" would have brought if sold on May 12, 1942.

My conclusion is, therefore, that the market value of the T2 type tanker may properly be used to ascertain the market value of the "Virginia".

## VII. The Value of the "Virginia"

The libellant produced five expert witnesses to testify to the market value of the "Virginia". Three of these witnesses, Messrs. Bagger, Martin and Haight, are surveyors and appraisers of ships, and all have had extensive experience in this profession—Mr. Bagger over thirty years, Mr. Martin over thirty-four years, and Mr. Haight over thirty-seven years. All of them testified that, in the conduct of their profession as ships surveyors and appraisers, they, of necessity, kept abreast of the sales of ships in the American market and were familiar with the various factors that entered into the determination of market value. All of these gentlemen, have, on numerous occasions, qualified as expert witnesses on the valuation of ships in the federal and state courts.

The respondent has not attempted to attack the qualification of these witnesses as experts. In the absence of such attack, and upon the record of the men, themselves, I conclude that they are, in fact, perfectly qualified to give opinion testimony as to the market value of ships and the existence or non-existence of a market for ships.

In addition to the three named witnesses, the libellant called Mr. Dietze, a ships broker and, in particular, a broker for tankers. Mr. Dietze testified, which testimony is not contradicted in any way, that in the conduct of his business as a ships broker, it was necessary for him to keep abreast of all sales of tank vessels and of ship values generally. Mr. Dietze has been in business for about twenty years.

The libellant also called Mr. Watts, Executive Vice-President of the Sinclair Oil Corporation of New York, and as such, director of the marine operations of that company, the supervision and operation of its tankers, a fleet of about thirteen, is directly under him.

The foregoing named witnesses gave varying opinions of the market value of the "Virginia", all of them using as the basis for such valuation the T2 type of tanker. The sole exception to this comparison is found in the testimony of Mr. Bagger who, in part, based his opinion on the prices paid the Maritime Commission for the T3 type tanker.

The use by these men, all of whom have had extensive and varied experience in the shipping industry, of the sales of the T2 type tanker as a yardstick for the determination of the value of the "Virginia" is particularly significant, especially in determining whether or not, for the purpose of this case, the T2 may be used as a comparison with the "Virginia".

The surprising fact about the testimony of these five witnesses is that they all arrived at approximately the same figure of valuation. The opinion expressed by the three ships appraisers was arrived at by computing the price per deadweight ton of the T2 type, applying certain factors to that price which would adjust that price for the greater speed of the "Virginia", and then multiplying the price thus arrived at by the deadweight tonnage of the "Virginia". In the testimony of Mr. Bagger and Mr. Haight, deductions were made for depreciation, the "Virginia" being at the time of her loss one year old, and further deductions for the absence, in the case of Mr. Bagger, of heater coils, and in the case of Mr. Haight, of heater coils and closed ventilation system. Mr. Martin, on the other hand, made no such deductions and there is testimony in the record, both from Mr. Martin and others, that depreciation on a one year old tanker was nominal at the most, and should not be allowed in determining the market value of such tankers.

The respondent insists strenuously that the valuation testified to by these three men is of no value in the present inquiry because it consists merely of simple mathematical computations. I am unable to accept the point of view of the respondent. It seems to me that these men testified as experts, not on the basis of their ability to use the multiplication tables, but upon the basis of their experience in the shipping industry, which enabled them to establish a yardstick and formula for the valuation of the "Virginia". Once that yardstick and formula have been established it then becomes, as the respondent properly says, merely a mathematical computation to arrive at the valuation of the vessel involved. It does injustice, however, to these men to say that they have done nothing any one with an ability to multiply could not have done. From their experience, they are perfectly capable of reaching a decision as to the comparability of two types of ships and whether the one type may be used as a basis for the valuation of the second type. It is, of course, obvious that the formula of valuation and the value of one type being definitely fixed, the computation of the value of the second is, in fact, merely mathematical. The field of the expert witness, however, lies not in the working out by mathematics of the value of the second type, but lies in the comparison of the two types, in order to determine whether the value of the one type is a proper yardstick to be applied to the second type. The expert witness also, from his experience, determines the necessary corrective factors to be

applied. In my opinion, that is what these men have done and I accept their valuation of the "Virginia" as proper expert testimony concerning that value.

This conclusion is strengthened by the fact that Mr. Watts and Mr. Dietze, approaching the problem of valuing the "Virginia" from an entirely different viewpoint, arrived at approximately the same valuation.

Mr. Dietze, for example, a ships broker who derives his income from commissions on the barrels of oil carried by ships, the charter of which he has arranged, testified that since the "Virginia" could transport in a given period of time approximately 20% more barrels of oil than the T2 type, in his opinion, the "Virginia" is worth 20% more than the T2. The 20% increased value of the "Virginia" is made up as follows— 12½% increased barrelage and 8% which represents the increased speed of the "Virginia" over the T2. Thus Mr. Dietze, taking as the market value of the T2, the round sum of $3,000,000 arrives at a value for the "Virginia" of $3,600,000 which he expressed as the minimum market value of the "Virginia" on May 12, 1942.

The reasoning of Mr. Dietze appeals strongly to me for the reason that necessarily the value of a ship must be determined by the amount of income it will bring in to its owner. The ship's income earning capacity is determined by its ability to carry cargo. This is extremely important when it is realized that both the T2 and the "Virginia" are beyond question suitable for the same trade.

Mr. Watts approached the problem of valuing the "Virginia" from the viewpoint of a practical operator of tankers seeking a replacement for the loss of a vessel of comparable deadweight tonnage. He testified that if, on May 12, 1942, the "Virginia" could have been purchased for around $3,-600,000 or $3,700,000, he would have recommended to the board of directors of his company the purchase of the vessel. This is merely another way of saying that, in his opinion, the "Virginia" was worth, on that date, approximately $3,650,000. Mr. Watts valued the "Virginia" largely on her deadweight tonnage and speed in comparison with the same items of the T2. He as-

sumed that the "Virginia" would on inspection have been found to be in good serviceable condition. As a matter of fact, the evidence shows that, on May 12, 1942, the "Virginia" was in good condition.

I do not think, therefore, that the method of appraisal by the three ships surveyors and appraisers can be said to be erroneous since the figures arrived at by these men roughly approximate the valuation placed on the "Virginia" by two men of equal experience in their own lines, both of whom value the "Virginia" on the basis of their particular demands of a vessel.

The respondent has not offered any expert testimony seeking to contradict the valuation testimony adduced on behalf of the libellant. It has contented itself with opposing the value placed on the "Virginia" by the libellant's witnesses on three grounds:

(1) That the method of appraisal is nothing more than a mathematical computation from the construction cost of the T2 type tanker. I believe that this contention has been disposed of by the foregoing.

(2) The respondent further opposes the value urged by the libellant on the ground that the construction cost of the "Virginia" itself was greatly less than the market value testified to by the libellant's witnesses. Mr. Ludwig, President of the libellant, testified, and the testimony has not been contradicted, that the figures introduced in evidence by the respondent purporting to show the construction cost of the "Virginia" do not, in fact, show the total cost. The reason given for this is that the shipyard building the "Virginia" was a wholly owned subsidiary of the libellant organized for the sole purpose of building ships for the libellant. From the standpoint of economy it was the desire of the libellant that the shipyard company should show no profit upon which taxes would have to be paid. Consequently, the figures shown on the income tax return of the libellant's shipyard introduced by the respondent do not accurately represent the construction cost of the "Virginia". The figures thus shown not only do not take into account the element of profit to the builder but, in fact, do not include many items of cost assumed by National Bulk Carriers, the parent corporation of

the shipyard. These omitted items include such items as overhead and the figure that would properly represent the various risks a shipbuilder would ordinarily assume and include in his bill for the construction of a vessel. Consequently, I am of the opinion that the figures offered by the Respondent to show the construction cost of the "Virginia", in fact, show only a portion of that cost. Furthermore, I think the law to be that where a comparable market exists from which the market value of a ship can be deduced, as I have found to exist in this case, other items which, in the absence of such a market, could be used to determine the market value of the vessel, may not be used. The reason for this is that the construction or reconstruction cost of a vessel is, at best, a mere indication of what the probable market value might be and is not, in itself, a measure of value.

(3) The respondent has also introduced in evidence various amounts of insurance carried by the libellant on the "Virginia", the total of which is less than the market value testified to by the libellant's witnesses. In the absence of a market, I am of the opinion that insurance on vessels could be used by the courts as some indication of what the probable market value of the vessel might be. However, in the instant case, it has been found as a fact that a comparable market does exist and, therefore, there is no necessity of looking for other means of determining the market value of the "Virginia." If the theory of the respondent is that the amount of insurance constitutes an admission or a declaration against interest by the libellant, I think that the libellant's witnesses have sufficiently explained the reason for the amount of insurance being less than the market value of the vessel.

I conclude, therefore, that the libellant is entitled to recover from the respondent by reason of the loss of the "Virginia" on May 12, 1942, the market value of the "Virginia" as of that date, which value is to be determined on the basis of the testimony of the libellant's expert valuation witnesses, which testimony is not contradicted by any of the respondent's witnesses. This being so,

we are faced with the practical matter of attempting to reconcile the minor discrepancies between the valuation figures of the various libellant's witnesses. I know of no way to do this except by averaging them together.

In order to give proper effect to the presence on the T2 and the absence on the "Virginia" of heating coils, the cost of which should be deducted from the market value of the "Virginia", I propose to average the values given without deducting therefrom the cost of heating coils. Since Mr. Bagger deducted $27,000 as the cost of the heating coils on May 12, 1942, his valuation should be increased by that amount.

I do not think it proper to deduct the cost of the closed vent system of ventilating the cargo tanks since such a system is necessary only for the carrying of Grade A cargoes which amount to less than 1% of the total of petroleum cargoes available for transport. I think, therefore, that the deduction of this item by Mr. Haight was improper and his valuation should be increased by that amount. Since he deducted a total of $55,000 as the cost of both the heating coils and the closed vent system, his valuation must be increased by that figure.

Making these additions to the values placed on the "Virginia" by Mr. Bagger and Mr. Haight, the values testified to by the experts are as follows:

| Name of Witness | Value on May 12, 1942 |
| --- | --- |
| Bagger | $3,638,000 |
| Martin | 3,572,000 |
| Haight | 3,595,000 |
| Dietze | 3,600,000 |
| Watts | 3,650,000 |
| Average valuation—$3,611,000 | |

From the average valuation thus obtained must be deducted the cost of the heating coils. Mr. Bagger has estimated this cost as $27,000 which seems to be in line with the general estimation of their cost. Deducting this sum from the average valuation figure, we obtain the sum of $3,584,000.

I am of the opinion, therefore, that the market value of the "Virginia" on May 12, 1942 was $3,584,000.

The libellant insists that the valuations listed above represent minimum valuations. I believe it is true that all of libellant's witnesses testified that, in a free market without Government control, the "Virginia" might have brought far more than the amounts testified to. It seems to me, however, that this testimony is very speculative. The figures testified to were all arrived at on the basis of the sale of T2s. If the price paid for the T2 type represents the market value of the T2, then it seems to me the values testified to for the "Virginia" are, in fact, its market value, if the comparison between the "Virginia" and the T2 type is justified. The libellant has elected to determine the valuation of the "Virginia" by comparison to the T2. I think the figure which I have set forth as the value of the "Virginia" on the date of her loss is proper upon the basis of a comparison with the sales of the T2 in accordance with the libellant's contention.

It may well be that the sales prices of the T2s themselves are low since those sales were made on the basis of estimated construction cost plus a certain percentage. However, there is nothing before me which will justify speculation as to what the T2s might have brought under other circumstances.

The respondent suggests, but does not argue at any length, that the provision in Section 902 to the effect that in no case shall the value of property taken be deemed enhanced by the causes necessitating the taking is applicable to the case of the "Virginia". The argument is not elaborated to any extent and I am unable to see its pertinence in the case at bar. In Rule 4 adopted by the Advisory Board on Just Compensation, it is stated that enhancement due to a general rise in prices should not be deducted. It also appears from uncontradicted testimony that the market value of the "Virginia" and, indeed, of all ships, was higher in 1941 than in 1942. I believe that there is no enhancement that should be deducted from the valuation figure set forth above.

## VIII. Interest

The order of reference of this case to the Special Commissioner directed that the libellant recover from the respondent "its damages in full * * * together with interest and costs". The parties to this cause are in disagreement as to the rate of interest to be allowed and the time from which interest is to run.

Libellant maintains that the instant case is a suit for "just compensation" for the loss of the "Virginia" and that part of "just compensation" is interest at the rate of 6% running from the date of loss. Respondent on the other hand maintains that the allowance of interest is governed by the provisions of the Suits in Admiralty Act, 46 U.S.C.A. 741–752, and that under that Act the allowance of interest on the award is discretionary with the court and if allowed, is limited to the rate of 4% running from the date of commencement of the action.

It seems to me that respondent has misunderstood the meaning of 46 U.S.C.A. § 1128d which authorizes the bringing of actions on account of insurance claims arising under Sections 1128-1128h. In my opinion, the language in Section 1128d to the effect that "Said suits shall proceed and shall be heard and determined according to the provisions of sections 741-752, of this title insofar as such provisions are not inapplicable and are not contrary to or inconsistent with the provisions of sections 1128–1128h" means only that in matters of procedure, etc., the provisions of Sections 741-752 govern. It does not mean that substantive rights are to be determined in accordance with the provisions of Sections 741-752. This must necessarily be so when it is considered that Sections 741-752 are designed solely to permit the bringing of suits in Admiralty against the United States in certain classes of cases involving torts or breaches of contract arising out of the operation by the United States of merchant vessels and, at the same time, prohibit the libel of merchant vessels belonging to the United States in rem—which was considered an objectionable feature. (See Note 4, 46 U.S.C.A. § 741). By their very nature, suits under Sections 741-752 could be at once instituted against the United States and thence arose the provision of the amendment of June 30, 1932

allowing interest only from the date of institution of the suit.

In the case at bar, however, a prerequisite to bringing suit is a "disagreement as to a claim for losses or the amount thereof" between the owner and the United States. This necessarily prevents the immediate institution of suit by the owner after loss and removes the justification for the award of interest only from the date of the institution of suit. This alone should be persuasive that Sections 741-752 have no pertinency in the case at bar except as a procedural guide.

The question, therefore, becomes what award of interest should be made in a suit on a War Risk Insurance Contract issued by the War Shipping Administration. That the case at bar is an insurance claim has been specifically held by this court. It has been further held that the insurance contract sued upon provides that the respondent will, in the event of the total loss of the "Virginia" pay libellant "just compensation" in accordance with Section 902 of the Merchant Marine Act, 1936, as amended. The libellant is entitled to be paid interest as a part of the award in this case, therefore, if an award of interest is properly a part of just compensation under Section 902.

There seems to be no doubt that interest is allowed as a part of just compensation in order to give the claimant the full equivalent of a value paid contemporaneously with the taking. Standard Oil Co. v. United States, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519.

The question remaining, therefore, is the rate of interest to be paid the libellant, said interest to run from the date of loss of the "Virginia". I am of the opinion that the reference in the War Risk Insurance Binder to just compensation under Section 902 of the Merchant Marine Act, 1936, as amended, resulted in an adoption of the rate of interest allowed on such claims as a part of the "valuation formula" which this court has held was adopted by the parties. Whatever the practice in the past may have been, it appears that the Court of Claims of recent years has been in the practice of allowing 4% interest as a part of "just compensation" under Section 902.

I am of the opinion that this interest award was adopted as a part of the valuation formula.

### IX. Computation of Amount Due Libellant

| | |
|---|---|
| Just compensation value of "Virginia" | $3,584,000.00 |
| Less payment on account July 15, 1943 | 1,265,609.88 |
| | $2,318,390.12 |
| Interest at 4% on $3,584,000.00 from May 12, 1942 to July 15, 1943 | $ |
| Interest at 4% on $2,318,390.12 from July 15, 1943 until date of payment | $ |
| Total— | |

LEAHY, District Judge.

After studying the report, the findings and conclusions of the Special Commissioner, I made critical examination of all the testimony and the documentary proofs.

█ The Commissioner, in fixing the value of the "Virginia", relied to some extent on comparisons with sales prices at which T2 tankers were sold by the government, which in turn were based on cost of construction. The final determination of cost as made by the Maritime Commission was not available to the Commissioner since the determination was made subsequent to the filing of his report. The respondent argues that, since the Commissioner considered the figures relating to T2 and T3 tankers as listed in libellant's Exhibit 13(a) as all-important and conclusive and that his finding of value of the "Virginia" followed from averaging the arithmetic calculations based upon those figures, the correct figures for cost now available should be considered. I think the Commissioner correctly ruled that evidence of comparisons with government-built T2 and T3 tankers was relevant and material. In reading the Commissioner's report, I inclined to the view that the main basis for his result was the witness testimony on valuation and that the comparison testimony was mainly corroborative of the witness testimony. But, against the government's con-

tention that it was all-important and conclusive and libellant's recognition or acquiescence in this contention[5], I think that the actual cost figures of the T2 and T3 vessels listed in libellant's Exhibit 13(a) should be made available to the Commissioner for his consideration.

I have not decided finally whether, irrespective of what the figures of actual cost may reveal, there is not sufficient evidence to support the Commissioner's report. It is certain that the Commissioner relied to some extent on comparison with cost figures of T2 and T3 tankers and that the superiority testimony related to superiority of an unknown. Since the unknown has now become definite, I think the actual cost figures should be made available. I reject entirely libellant's contention that "readjustment in the figures shown in Exhibit 13(a), based on final determinations by the Maritime Commission, would be so trivial as to be unworthy of consideration in any event", for the libellant simply does not know the percentage of readjustment.

The matter should be re-referred to the Commissioner; the actual cost figures presented to him; and he should then determine if this new evidence is to change in any respect the findings heretofore made by him. This course has been selected because it is clear libellant will receive its final award, in fact, much quicker if the record is made complete. After the Commissioner has reported on this additional reference, I think the matter can be disposed of by this court in a matter of days.

The Special Commissioner later filed his Supplemental Report. It follows.

## WOLCOTT, Special Commissioner.

### Introductory

### I. Proceedings Before the Special Commissioner

By order of February 15, 1946, this cause was referred to the Special Commissioner to ascertain and compute the amount which the libellant is entitled to recover in the above entitled suit and to report thereon with all convenient speed. On October 21, 1946, the Special Commissioner, having held hearings, filed his report recommending an award to the libellant and, thereafter, on December 10, 1946, filed recommended Findings of Fact and Conclusions of Law. The respondent duly excepted to the report of the Special Commissioner and to the Findings of Fact and Conclusions of Law recommended, which exceptions came on for hearing before the court on February 25, 1947. On May 7, 1947, an order of this Court was entered re-referring this cause to the Special Commissioner for the presentation to him of the figures constituting the actual cost of the T2 and T3 vessels listed in libellant's Exhibit 13(a) as finally determined by the United States Maritime Commission and . ordering the Special Commissioner after determining if the new evidence thus presented changed in any respect the findings theretofore made and recommended, to report thereon to the court with all convenient speed. This supplemental report of the Special Commissioner is filed pursuant to the order of May 7, 1947.

Pursuant to notice given by the Special Commissioner to counsel for the libellant and respondent, the hearing pursuant to the order of re-reference was held in the Federal Building, Wilmington, Delaware, at 11:00 o'clock a.m. Daylight Saving Time on June 11, 1947. Said hearing was adjourned on the same date.

The stenographic minutes of the hearing and exhibits for both libellant and respondent are submitted herewith.

Counsel for both libellant and respondent having stated their respective positions and contentions with respect to the new evidence on the record, indicated that they did not desire to submit briefs in connection with their arguments.

### II. The New Evidence Offered

At the re-hearing, the respondent offered Exhibits 30, 31, and 32 which purport to

---

[5] At page 12 of libellant's memorandum, it states: "Since the value of the 'Virginia' in this case has been fixed by the Commissioner by comparisons with the sales prices at which T2 tankers were sold by the Government, which were in turn based on cost of construction, it can hardly be said that the value placed on the 'Virginia' is inflated by the state of the market."

show reductions in the costs of the T2 tankers listed on libellant's Exhibit 13(a).

Respondent's Exhibit 30 is a summary schedule of final determination of costs by the Maritime Commission of the T2 and T3 tankers listed on libellant's Exhibit 13(a). Respondent's Exhibit 31 is representative of all covering letters addressed to the purchasers listed on libellant's Exhibit 13(a). Respondent's Exhibit 32 is the final cost statement referred to in respondent's Exhibit 31.

A study of respondent's Exhibit 30 indicates that the final determination of costs by the Maritime Commission is less in all instances than the estimated costs set forth in libellant's Exhibit 13(a). The amounts vary in the case of the individual vessel, but an average of the reductions in the case of the T2s shows an average decrease in cost of $115,619.32 per vessel.

### III. Contention of Respondent

Counsel for respondent at the re-hearing argued that, in making the award of damages, the Special Commissioner took the figures representing the "sales price per preferred mortgage" contained in libellant's Exhibit 13(a) as the actual sales prices of the vessels listed therein and that, accordingly, the contracts under which those sales were made must be looked at to determine whether or not that figure is the actual sale price for the particular vessel. The contracts under which the sales were made obligate the purchasers to pay the final cost of the vessel to the Maritime Commission and preliminarily estimate the cost at a certain figure which is the figure set forth in libellant's Exhibit 13(a). The figures offered at the re-hearing are in fact the Maritime Commission's final determination of costs and these figures, according to counsel for the respondent, are the figures which should have been used by the libellant's expert witnesses in testifying as to their opinion of the value of the "Virginia" based upon the sales of the T2 tankers.[6]

Counsel for respondent further argues that the Special Commissioner must now correct the award recommended by him to bring it into line with the final determination of costs by the Maritime Commission. In other words, respondent seeks to correct, as to the sales price, libellant's Exhibit 13(a) upon the ground that it does not actually represent the cost to the purchasers of the vessels listed in libellant's Exhibit 13(a).

### IV. Contention of Libellant

Counsel for the libellant argues against the admissibility of respondent's Exhibits 30, 31, and 32 on the ground that the information set forth in these Exhibits is entirely immaterial to the issues. This argument seems to be premised upon the theory that libellant's Exhibit 13(a) is material only because it shows that, on or about the date of loss of the "Virginia" in 1942, purchasers were willing to pay the figures set forth in libellant's Exhibit 13(a) for vessels comparable to the "Virginia" and this being so, a value of the "Virginia" by the proper application of corrected factors can be determined.

### V. The Effect of the New Evidence on the Value of the "Virginia"

Respondent has not attempted to suggest a method of re-determining the values placed on the "Virginia" by the expert witnesses of libellant in the light of the reduction in final cost of the T2 tankers, nor did the respondent request the re-call of the libellant's expert witnesses for the purpose of cross-examination in the light of the reduction in cost of the T2 tankers. In view of this situation, I do not feel that I can attempt to recast the testimony of these expert witnesses in order to determine what value they would have placed upon the "Virginia" had they known that in 1946 the final determination of cost of the T2 tanker would be on the average of $115,619.32 less than the average estimate of cost of the T2 tankers based upon libellant's Exhibit 13(a).

I cannot say that, faced with this additional fact, the libellant's expert witnesses would have made an appropriate reduction

---

[6] The value of the T3 type tanker was not relied upon by the Special Commissioner in making the award. (See footnote pp. 20 and 21.)

in their testimony as to the value of the "Virginia". It seems to me, in view of the complex factors which entered into the testimony of the witnesses on valuation, that I, as Special Commissioner, should not have the temerity to attempt to re-cast the testimony of these gentlemen. Such an attempt would, it seems to me, be extremely speculative and would probably put in the mouths of these witnesses testimony which they, themselves, might not have given.

If, therefore, the reduction in cost of the T2 tankers is to be given effect, it seems to me that the reduction can only be applied to the average valuation of the expert witnesses appearing on page 34 of the First Report, to wit, the sum of $3,611,000. There is testimony in the record that the "Virginia" was approximately 20% more valuable than the T2 tanker. A rough approximation of the possible effect of the new evidence offered by the respondent at the re-hearing could then be obtained by taking five-sixths of the valuation of the "Virginia" which would thus give the average value of the T2 tanker to which the reduction could then be applied. Making this computation, we arrive at the sum of $3,009,166 as the average opinion of the expert witnesses of the value of the T2 tankers. Deducting the decrease in cost of the T2 tanker of $115,619.32 from the average T2 value thus obtained, we obtained, the sum of $2,893,546.68 which is possibly a rough approximation of the corrected average value of the T2 tanker in the light of the decreased cost. In order now to obtain the new average value of the "Virginia", we must increase the actual cost of the T2 tanker by 20% or the sum of $578,709.34, reaching a new average valuation for the "Virginia" of $3,472,256.-02.

Since the cost of heating coils was deducted from the average value of the "Virginia" (see page 34 of the First Report), this must, again, be deducted. The sum representing the cost of heating coils is $27,000 which, deducted from the new average valuation of the "Virginia", leaves the sum of $3,445,256.02 as a possible market value of the "Virginia" reflecting the decrease in cost of the T2 tanker.

The figure thus arrived at, at best, is only a rough approximation of the reflection in the value of the "Virginia" of the average decrease in cost of the T2 tanker. It is my opinion, however, that this sum very possibly might not reflect a correction of the testimony of the expert witnesses if that correction were to be made by the witnesses themselves. It is nothing more than a theoretical mathematical calculation on the average value placed upon the "Virginia" by the experts. I do not think that it can be said that $115,619.32 being the average decrease, necessarily represents an actual decrease in the market value of all T2 tankers since an examination of respondent's Exhibit 20 indicates that the decreases range from $2,637.43 in the case of the "Buena Vista" to a high of $208,387.-80 in the case of the "Vera Cruz". It seems to me that it is dangerous to make rule of thumb deductions based on averages without knowing the causes of the reductions in the individual cases.

The computations set forth above, at best, represent a mathematical guess as to the effect of the decreased costs of the T2 tankers. They are set forth merely for the convenience of the Court and for the purpose of illustrating one possible difference in the final determination of the value of the "Virginia". However, for reasons which will appear hereafter, I am of the opinion that no reduction should be made in the final award to the libellant.

## VI.   Conclusion

My conclusion is that the position taken by the libellant with respect to the evidence submitted by the respondent at the re-hearing is correct. I think that the final determination of costs in 1946 by the Maritime Commission is entirely immaterial to the question of what sum would have resulted from the sale of the "Virginia" as a result of "fair negotiations between an owner who is willing to sell and a purchaser who desires to buy". Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 44 S.Ct. 471, 475, 68 L.Ed. 934.

In the report heretofore filed, the determination of the award of damages rests upon the testimony of the libellant's expert

witnesses, yet, that testimony in turn, in part, rests upon the facts set forth in libellant's Exhibit 13(a). It was and still is my opinion that the prices set forth in libellant's Exhibit 13(a) represented sums which the purchaser of each vessel listed in that Exhibit, on the date of sale, was willing to pay for that vessel. This fact, it seemed to me, established the necessary requirement of a willing buyer purchasing in the only market available to him. It seemed to me then, and it seems to me now, to be entirely immaterial that at some subsequent date, which has actually proven to be 1946, (over four years after the loss of the "Virginia"), the price agreed to be paid at that time has been scaled down by a determination of final costs. As far as the purchaser knew on the date he entered into the contract of sale with the Maritime Commission, the final determination of costs might have been greater than the sum now offered as the actual final cost.

Since, under the cases set forth in the First Report, the measure of damages is the sum which would result from negotiations between a hypothetical willing seller and willing buyer, the all-important fact which must be determined is what, on the day of loss, a hypothetical willing buyer would have paid. It seems to me that a willingness to pay a certain sum on a certain date is excellent evidence of what a willing buyer would pay at or about that date, even though there was provision for ultimate adjustment of the price. As far as any one could tell at that time, the final price might well have been greater.

The foregoing observations lead me to the conclusion that the first report should not be modified in any way by reason of the evidence offered at the re-hearing.

The evidence was offered and received by the Special Commissioner over the objection of immateriality of counsel for the libellant. I shall, therefore, treat this objection as a motion to strike the evidence now in the record and hereby grant the motion and order respondent's Exhibits 30, 31 and 32 struck from the record.

This conclusion avoids the necessity of passing upon libellant's Exhibit 34 which was offered in opposition to the conclusiveness of the Maritime Commission's final determination of costs set forth in respondent's Exhibits 30, 31, and 32. In any event, I am of the opinion that libellant's Exhibit 34 goes to the weight of the respondent's new evidence and, since I have excluded such evidence of the final determination of costs of the vessels listed in libellant's Exhibit 13(a), the new offer of libellant is, itself, immaterial and I, accordingly, order it struck from the record.

LEAHY, District Judge.

After a consideration of the Report and Supplemental Report of the Special Commissioner, respondent's objections thereto and the briefs and arguments of the proctors, I adopt the Reports, the Findings and Conclusions of the Commissioner, and think they are proper, valid, and should be confirmed, with one exception. I do not think libellant is entitled to interest from the date of the loss of the vessel. Interest on claims against the United States is regulated by statute (28 U.S.C.A. § 284). Libellant has no right against respondent for interest unless it is given by statute or is the subject of specific covenant in the light of the general rule that interest is not generally recoverable against the sovereign. Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 49 S.Ct. 52, 73 L.Ed. 170; Pennell v. United States, D.C., 162 F. 75; Watts v. United States, D.C., 129 F. 222. Here, the only basis upon which a claim may be rested for interest is the Suits in Admiralty Act, as amended (46 U.S.C.A. § 745). Interest should be at the rate of 4% and, as provided in that Act, should be computed on the balance found to be due libellant from the date of the institution of the present action. In all other respects the Reports, the Findings and Conclusions of the Commissioner are confirmed.

A decree may be submitted.