## NATIONAL BULK CARRIERS, Inc. v. UNITED STATES.

### THE WILLIAM C. McTARNAHAN.

No. 1568.

United States District Court
D. Delaware.

Feb. 2, 1949.

Leonard J. Matteson and Julian S. Gravely, Jr. (of Bigham, Englar, Jones & Houston), and Samuel D. Antopol, all of New York City, and Abel Klaw, of Wilmington, Del., for libellant.

J. Frank Staley, Sp. Asst. to the Atty. Gen., and Jess H. Rosenberg, Atty., Dept. of Justice, and Benjamin H. Berman, Atty., War Shipping Administration, both of Washington, D. C., and William Marvel, U.S. Atty., of Wilmington, Del., for United States.

Daniel F. Wolcott (of Southerland, Berl & Potter), of Wilmington, Del., special commissioner.

LEAHY, Chief Judge.

The Court appointed Daniel F. Wolcott, Esquire, as a Special Commissioner to re-

port his findings of fact and conclusions of law and the amount of award to which libellant was entitled for the loss of two ships. His report as to the first vessel and its confirmation is found in D.C.Del., 73 F.Supp. 622. The action of the Special Commissioner and this Court was affirmed in National Bulk Carriers v. United States, 3 Cir., 169 F.2d 943.

 Mr. Wolcott has now filed his report as to the second vessel. After studying this report, the findings and conclusions of the Special Commissioner, as in the case of the first ship, I made critical examination of the testimony and the documentary proofs. I find no reason to modify his report or his recommended Findings of Fact and Conclusions of Law. The case has clearly received full, careful and extensive consideration from the Special Commissioner. The thoroughness of his considerations is reflected in his report, and as was done in the case of the first vessel, see 73 F.Supp. 622, I think it should be published. The report and recommendations are entitled to a presumption of correctness, P. Sanford Ross, Inc. v. Public Service Corporation, 3 Cir., 42 F.2d 79,[1] but in addition to that the findings have substantial foundation of credible evidence and they should not be disturbed. The report, which follows, should be confirmed by appropriate order.

WOLCOTT, Special Commissioner.

## I. Introductory.

This is one of two cases between the parties hereto, seeking to recover just compensation for the total loss of two tank vessels owned by the libellant and requisitioned on a time charter basis by the respondent.

On February 15, 1946, an order of reference to me as Special Commissioner was entered, directing that I ascertain and compute the amount which the libellant is entitled to recover. The first of the two cases has been heard and decided. See The Virginia, D.C. 73 F.Supp. 622. This is the second of the two suits covered by the order of reference.

This suit is instituted for the recovery by the libellant from the respondent of the amount due it for the constructive total loss of the motor tank vessel William C. McTarnahan, resulting from the torpedoing of that vessel by enemy action on May 16, 1942.

On April 20, 1942, the McTarnahan was requisitioned by the respondent under the authority of Section 902 of the Merchant Marine Act of 1936, as amended, 46 U. S.C.A. § 1242, on a time charter basis, and thereafter respondent delivered to libellant its requisition time charter for tank vessels, Warshipoiltime Form No. 102. The said charter provided that war risk insurance should be assumed by the respondent. Actually, the war risk insurance assumed by the respondent was just compensation according to Option II of Section E of the time charter. This means that the libellant was entitled to receive from the respondent just compensation in the event of the total loss of the McTarnahan in accordance with Section 902 of the Merchant Marine Act of 1936, as amended.

 On May 16, 1942, the McTarnahan was torpedoed but remained afloat. The vessel was subsequently practically rebuilt by the Maritime Commission as the St. James. In the meantime, however, the McTarnahan had been found to be a constructive total loss as of May 16, 1942. In the proceedings before me, therefore, the amount of the award is to be determined as though, on May 16, 1942, the McTarnahan was actually sunk and thereby became a complete and total loss to the libellant.

 It seems unnecessary to review the prior proceedings in this cause since it will suffice to refer to the decision of this court in National Bulk Carriers v. United States, D.C., 73 F.Supp. 622, the companion case, holding that the effect of the option of the time charter and of the war risk insurance binder was to set up by agreement of the parties a valuation formula for

[1] And see Admiralty Rule 43½, 28 U. S.C.A.; The Petar, D.C., 68 F.Supp. 296, affirmed 2 Cir., 165 F.2d 738; Pioneer Import Co. v. Lafcomo, 2 Cir., 159 F.2d 654; Todd Erie Basin Dry Docks v. The Penelopi, 2 Cir., 148 F.2d 884.

determining the value of the McTarnahan which formula is just compensation to be determined in accordance with Section 902 of the Merchant Marine Act of 1936, as amended.

It appears on the record that all questions of damage have been settled between the parties with the exception of the loss of the McTarnahan, itself. The only question, therefore, to be determined is the amount remaining to be paid by the respondent to the libellant as just compensation for the total loss of the McTarnahan while chartered by the respondent.

On or about February 27, 1943, negotiations between the parties for settlement having failed, the respondent paid to the libellant the sum of $1,227,389.34, which sum represented 75% of the determination by the War Shipping Administration dated December 31, 1942 that just compensation for loss of the McTarnahan was the sum of $1,619,591.07, the said determination of just compensation having been rejected by the libellant on the same date.

## II. Proceedings Before the Special Commissioner.

Pursuant to notice, hearings were commenced before me as Special Commissioner, in the Federal Building, Wilmington, Delaware, on October 1, 1947. Thereafter, hearings were held on October 2, 1947, October 3, 1947, October 8, 1947, October 9, 1947, and October 10, 1947 on which day the hearings were concluded. Thereafter, the case was submitted on briefs.

Transmitted herewith are the stenographic minutes of the hearings, exhibits for both libellant and respondent, and the briefs of counsel.

Following the procedure adopted in the case of The Virginia, it is intended by me that, after the filing of this report, the recommendations of counsel as to proposed findings of fact and conclusions of law will be filed with me and thereafter a supplemental report will be filed by me recommending the adoption of proposed findings of fact and conclusions of law.

## III. The Measure of Damages.

It is needless to reassert the authorities set forth in my report in the case of The Virginia which define the measure of damages to be applied in a case of this nature. Since the measure adopted in the case of The Virginia has been specifically approved of by this court, it follows that that measure is controlling and is to be applied in the instant case. The measure of damages so applied is just compensation for the property taken. It is defined as the sum of money which, considering all the circumstances, would in all probability have been paid for the vessel at the time of loss as a result of fair negotiations between an owner willing to sell and a purchaser desiring to buy. This sum may properly be called the market value of the vessel at the time of loss contemporaneously paid in money.

Whenever there is an established market of similar or comparable vessels at or about the time of loss, it is wholly proper and, in fact, mandatory to determine the value of the lost vessel from that contemporaneous market. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890.

In the absence of a market of comparable ships from which value may be determined, other evidence must be resorted to as guides in the determination of what would have been the market value had a market been in existence and the vessel available for sale at the time of loss. It is permissible in this connection to utilize facts which tend to show market value but which, of themselves, are not the absolute criterion as to what that value might be. Thus it is permissible to refer, in the absence of sales of comparable vessels, to the cost of reproduction, earnings, appraisals for insurance or other purposes, and any other relevant facts upon which a reasonable judgment can be based. Standard Oil Co. v. Southern Pacific Co., supra; The Hiske, 2 Cir., 54 F.2d 540.[1a]

It seems clear to me that, in an inquiry of this nature, there can be no hard

---

[1a] See, also, Rule 3, Report of the Advisory Board on Just Compensation to War Shipping Administration, dated December 7, 1943.

and fast rule determining the materiality of facts which have some evidentiary use in the determination of the value of a vessel. The only limitation in this respect is that the offer of the evidence must have a reasonable connection with the inquiry. The rule seems to be that, from all the circumstances offered, some of which by themselves may have little weight, the court must arrive at a reasonable conclusion. No hard and fast formula or test can be applied. For example, it cannot be said that the cost of construction as of the day of loss is the sole measure of damages. The cost of construction, however, may properly be taken as evidence of the minimum value of the lost vessel. This seems clear from the use to which reconstruction cost less depreciation was put in the case of The Hisko, supra, in determining the value of that ship.

IV. The Characteristics of the McTarnahan.

The William C. McTarnahan was a motor tank vessel owned by National Bulk Carriers, with the following characteristics:

| | |
|---|---|
| Official Number | #240865 |
| Built | July, 1941 |
| Port of Registry | Wilmington, Deleware |
| Call Letters | W I G N |
| Length Reg. | 416.5 |
| Breadth Reg. | 56.2 |
| Depth Reg. | 34.7 |
| Gross Tonnage | 7302 |
| Net Tonnage | 5826 |
| Total Cargo Capacity | 637,677 cu. ft. |
| Total barrels per Say-Bolt strappings | 112,170 |
| Total barrels less 2% for expansion | 109,927 |
| Total deadweight at Int. Summer draft 28' 08" | 12.610 |
| Total Displacement. | 15,560 |
| Emergency Summer Coastwise Draft 29'-4-1/2" | 29'4-1/2" |
| Freeboard Int. Summer | 6'5-1/2" |
| Freeboard Emergency Coastwise | 5'9" |
| Main Engines | McIntosh & Seymour built in 1929 rebuilt 1941 consisting of 2-8 cylinder single acting turbo charged 8-B-40 Diesel Engines direct connected to Propellor shaft |
| Speed | 11 knots |
| Power rating | 1700 BHP per each engine |
| Classed | X–100A–1 LMC |
| Spec. Survey No. 1 | Due July, 1945 |
| Certificate of Inspection | Expires July 28, 1942 |

From the foregoing, it will appear that the McTarnahan at the date of her loss was slightly over 10 months old. The evidence is uncontradicted that, at the time of her loss, the McTarnahan was in good serviceable condition less whatever wear and tear would have been occasioned by her approximate 10 months age.

V. Contention of Respondent that the Value of the McTarnahan can be Determined from the Market of T2-SE-A1 [2] Tankers Existing in 1942 as the Same was found in the Case of The Virginia.

There is in the record a stipulation to the effect that, in the hearing on the question of the value of the McTarnahan, reference might be made by either side to material parts of the record made in the case of The Virginia. The respondent contends, on the basis of this stipulation, that it is permissible for it to utilize the entire Virginia record and the testimony of the expert witnesses for the libellant in that case with reference to the valuation of The Virginia on the basis of the market of the T2 type tanker. Libellant contends that the stipulation referred to is not of such a nature as to permit this. For reasons which will be apparent later, it is not necessary to determine the extent of the stipulation.

Basically, the argument of the respondent is that the McTarnahan is simply a smaller edition of The Virginia. This proposition is controverted by the libellant. However, assuming it to be true, it is also true that The Virginia has 6,190 more tons of deadweight than does the McTarnahan, and has a greater speed of 4.7 knots. The T2 type of tanker has 4,160 tons more deadweight and 3.6 knots more speed than does the McTarnahan.

The respondent argues that since, in The Virginia case, libellant's experts testified that it is permissible by the proper application of corrective factors to compare for valuation purposes ships with a difference in deadweight of 2,030 tons and a difference in speed of 1.1 knots, it is equally proper, by the application of the same corrective factors, to compare for valuation purposes ships having a deadweight dif-

2 Hereinafter referred to as T2.

ference of 4,160 tons and 3.6 knots of speed.

I do not believe that the inferences drawn by the respondent from the testimony of libellant's witnesses in the case of The Virginia are justified. There is in this record, and in the record of The Virginia, testimony to the effect that the smaller the deadweight capacity of a ship, the more expensive it is per deadweight ton. There is also testimony to the effect that ships may be divided into several general classes according to their size, and that ships of approximately 12,000 tons deadweight are in an entirely different class so far as value and cost is concerned from ships of approximately 16,000 tons deadweight.

The argument of the respondent in this respect is based largely on inferences from the testimony of libellant's witnesses in the case of The Virginia. I do not think it proper to accept as a basis for a decision in the case of the McTarnahan such inferences unless the witnesses from whose testimony the inferences are drawn, themselves, were given the opportunity to affirm, deny or explain their testimony in the light of the comparison sought to be made.

Furthermore, in the instant case, respondent's own witnesses, Messrs. Morrell and Sturm, specifically testified that, in their opinion, there was no market of comparable ships in 1942 from which the market value for the McTarnahan could be determined. Mr. Schrader, the third expert witness for the respondent, did not purport to testify to anything except the reconstruction costs of the McTarnahan in 1942.

For these reasons, I do not consider that the testimony adduced in the case of The Virginia with respect to the existence of a market of T2s and the arrival at a value of the comparable vessel for that market is pertinent and material in the present inquiry.

## VI. The Valuation Witnesses for Libellant.

### A. George W. Szepinski

Libellant called as an expert George W. Szepinski, Naval Architect and Marine Manager for the Alabama Drydock & Shipbuilding Company of Mobile, Alabama. His employment with the Alabama Drydock Company consisted of the direction of all engineering work at that yard, and estimating the cost of construction of vessels. During the war, he was in charge of the shipbuilding division and is in charge of such repairs as the yard may be making.

Mr. Szepinski testified that, in his opinion, in May of 1942, it would have cost $2,258,000, to duplicate the McTarnahan as she was on May 16, 1942.

His method of estimating this cost was by comparison of the size, deadweight and horsepower of the McTarnahan with other tankers constructed at or about the time of loss of the McTarnahan. His estimate is based principally on the deadweight tonnage of the McTarnahan and on its price per deadweight ton cost of construction. He testified that, had he been asked by his employer to estimate the cost of construction of a ship similar to the McTarnahan in May, 1942, he would have prepared his estimate in this manner.

He testified that the McTarnahan per deadweight ton cost was arrived at on the basis of several estimates made in detail of the cost of construction of tankers somewhat larger than the McTarnahan, and on the basis of figures in Maritime Commission publications of tanker prices. The method of comparison consisted in plotting the per ton deadweight cost of several tankers of different sizes and speeds and, on the basis of these known costs, drawing a curve from which the per deadweight ton cost of any ship of known characteristics could be determined. A ship of the characteristics of the McTarnahan, according to the curve so constructed, has a per deadweight ton cost of $179. The curve used by Mr. Szepinski appears in the record as Respondent's Exhibit 5A.

### B. James Donald

Libellant also called James Donald, a Naval Architect, as an expert witness. Mr. Donald has had extensive experience as a naval architect. In addition, he has had experience as an appraiser of ships and has, on numerous occasions, testified in court as an expert witness on valuation.

He testified that the price for the William C. McTarnahan as of May 16, 1942 which would have been arrived at as a result of fair negotiations between an owner willing to sell and a purchaser desiring to buy was $2,310,000. The basis upon which he arrived at this figure was by a comparison with the Liberty ship of about the same speed and deadweight tonnage as the McTarnahan. The cost per deadweight ton of the Liberty ship was $170. Since the Liberty ship is a dry cargo vessel and, since a tanker is a more expensive ship to build than a dry cargo vessel, he added to this deadweight cost per ton the sum of $15 which, he testified, is recognized in the shipbuilding business as the differential between the per deadweight ton cost of a tanker and a dry cargo vessel. This $15 differential, said Mr. Donald, was determined by a comparison of the exact known cost of a tanker and the exact known cost of a dry cargo vessel of about the same speed and deadweight. Making the computation required, we obtain the sum of $2,332,850, from which Mr. Donald deducts the sum of $22,745, representing depreciation on the McTarnahan for her 10 months of age at 2½%. Taking round figures, we therefore get the sum of $2,310,000 as Mr. Donald's opinion of the market value of the McTarnahan in May 1942.

Mr. Donald also testified that he had checked the estimate thus given by a comparison between the McTarnahan and the St. James. On the basis of this comparison, he testified that the value of the McTarnahan would be $2,364,000.

A further comparison he made was with the four Sinclair Oil ships which are about the same deadweight tonnage as the McTarnahan but have a greater speed which would give a value to the McTarnahan of $2,385,000.

He testified that the two latter comparisons were made merely as a means of checking his original estimate, and it was his opinion that the original estimate was the proper figure to be set down as the market value of the McTarnahan in May, 1942.

C. Thomas L. Stanley.

Thomas L. Stanley, called by the libellant, is a Consulting Engineer and Marine Surveyor with extensive experience. He testified that, in his opinion, the William C. McTarnahan, had she been sold on May 16, 1942 by an owner willing to sell to a purchaser willing to buy, would have brought as a result of fair negotiations between them the sum of $2,307,630.

Mr. Stanley arrived at his opinion as to the market value of the McTarnahan on the basis of a valuation on four vessels of the Sinclair Opalene type which had speeds of approximately 12.8 knots and a deadweight tonnage of 12,160 tons. The average cost per deadweight ton of these four vessels is $192 and since these vessels had a difference in speed over the McTarnahan of 1.8 knots, the price per deadweight ton must be reduced to compensate for this speed which, on the basis of $5 per knot per deadweight ton, would call for a reduction of $9 per deadweight ton, giving a price per deadweight ton of the McTarnahan of $183, which, multiplied by her 12,610 deadweight tons, gives a total of $2,307,630. That sum, testified Mr. Stanley, represented his opinion of the fair market value of the McTarnahan in May of 1942.

Mr. Stanley testified that the deduction of $5 per knot per deadweight ton was standard international practice among estimates and appraisers as representing the proper differential for differences in speed between one ship and another. Mr. Stanley also testified that, since the McTarnahan at the time of her loss was less than a year old, he did not think it proper to depreciate any part of her value.

D. William W. Wagner

Mr. Wagner, Vice-President and Treasurer of the libellant, was called and testified concerning the net earnings of the Petrofuel,[3] a sistership of the William C. McTarnahan. His testimony indicated that

---

[3] The Petrofuel is apparently identical in characteristics with the McTarnahan.

the net income of the Petrofuel under W. S.A. Charter hire was as follows:

| 1942 | $446,274.55 |
| 1943 | 460,530.73 |
| 1944 | 271,302.63 [4] |
| 1945 | 310,789.99 [5] |

Mr. Wagner testified that W.S.A. General Order No. 37 contemplated with respect to new vessels a use rate schedule (bare boat charter rates) on the basis of an allowance of 5% depreciation and 10% return. He also testified that the use charter rate of the Petrofuel in 1944 amounted to $23,013.25 per month in 1944. On this basis, capitalizing the use rate of the Petrofuel by multiplying the monthly rate by twelve to produce an annual rate and then applying a 15% capitalization thereto, the value arrived at is $1,841,060. This was the capitalization of the Petrofuel in 1944 on the service rate applicable to a vessel built in 1941 under the provisions of General Order No. 37. Applying the 5% depreciation figure for each year, the sum of $1,841,060 therefore represents 85% of the value new of the Petrofuel, which new value is computed to be $2,165,952.94.

Mr. Wagner also averaged the net earnings of the Petrofuel, which average out to be $453,402.64 as the net income for the Petrofuel under the original W.S.A. Charter for the vessel for the years 1942 and 1943. On the basis of the Charter hire for '42 and '43, capitalizing the rate as representing a 15% return, a new value of the Petrolfuel of $3,022,684.26 is obtained.

Averaging the net income for the years '44 and '45, which comes to $291,046.31, if that is capitalized as representing 15% return on the value of the vessel, a total new value of the Petrofuel on that basis of $2,282,716.15 is obtained.

If the average net income for the four years of $372,224.47 is capitalized on the basis of 15% return, a value of $2,481,496.46 is obtained.

■ The testimony of Mr. Wagner with respect to the earnings of a sistership of the Petrofuel was received in evidence over the objection of the respondent with the right to argue the question of admissibility in the briefs. I overrule the objections of the respondent to the admission of this testimony since, in my opinion, a court may properly accept any reasonably relevant evidence which will tend to show the market value of a vessel. It seems to me that while the computations made by Mr. Wagner on the basis of net earnings and Charter hire may be somewhat speculative, nevertheless, earnings of a vessel certainly are an element of value and this is some evidence of the earning capacity of a sistership of the McTarnahan.

## VII. The Respondent's Witnesses as to Value.

The respondent called as a witness William Schrader. Mr. Schrader, an employee of the Maritime Commission, is a Naval Architect and, at the present time, is Assistent Chief of the Cost Division in the Technical Bureau of the Maritime Commission and has been such for approximately eight years. In general, his responsibilities in the Maritime Commission are the making of estimates for new ship construction, conversions and making recommendations for the awarding of contracts for the building of ships based on his estimates. He testified that, roughly, the estimates for 5,600 ships of all types built for the Maritime Commission had either been made by him or under his direct supervision. His duties embrace not only estimating costs for new construction, but determining the actual audited construction costs of the ships built for the Maritime Commission.

Mr. Schrader testified as to an estimate of the probable replacement or reproduction cost of the McTarnahan as of May 16, 1942. His total estimated cost of reproduction is $1,750,500.

Mr. Schrader testified that it was improper to estimate construction costs on the basis of a per ton deadweight price, this method being characterized by him as a rule of thumb. His own method and that used by the Maritime Commission is to break down the lightweight of the ship into three categories and apply to each cat-

---

[4,5] Figures lower because of a change in the Charter Hire for these years.

egory a unit price. These unit prices applied by Mr. Schrader are unit cost figures arrived at from actual costs of ship construction in 1941 available to him in files of the Maritime Commission.

The estimate of Mr. Schrader of replacement cost of the McTarnahan broken down into units and unit costs are as follows:

| Hull Steel | | |
|---|---|---|
| 2290 tons at $250.00 | | $ 572,500.00 |
| Outfit | | |
| 450 tons at $900 | | 405,000.00 |
| Machinery | | |
| 2300 SHP at $206 | | 473,800.00 |
| Supercharger | | 52,000.00 |
| Design, Insurance | | 50,000.00 |
| Total 1941 Cost | | $1,556,000.00 6 |
| Add 12-1/2% increase of costs as of | | |
| May, 1942 over 1941 | | 194,500.00 |
| Total cost of Reproduction May 1942 | | $1,750,500.00 |

### B. Robert W. Morrell

Robert W. Morrell was called as an expert witness for the respondent and is a Consulting Naval Architect, Marine Engineer and Surveyor. Mr. Morrell testified that, in his opinion, the value of the McTarnahan as of May 16, 1942 was the sum of $1,587,600 based essentially on an estimate of construction costs as of May, 1942 with a correction for depreciation back to the date the McTarnahan was completed, together with an allowance for the second-hand or used machinery that was built into the McTarnahan at the time of her completion.

Mr. Morrell used the same method of estimation used by Mr. Schrader. That is, he broke down the ship weights into hull steel, outfit, and machinery, and applied unit costs which, as he testified, represent the May, 1942 costs of construction. His estimate may be stated as follows, correcting the mathematical error made by Mr. Morrell:

| Hull Steel | | |
|---|---|---|
| Material 2413 tons at $67.20 | $162,154.00 | |
| Overhead on same 15% | 24,323.00 | |
| Labor at $123.20 per ton | 297,282.00 | |
| Overhead on same 55% | 163,505.00 | |
| | $647,264.00 | |
| Profit 10% | 64,726.00 | |
| Total (equals 295.48 per ton) | | 712,990.00 |

| Outfit | | |
|---|---|---|
| Material 247 long tons at | | |
| $457 | 113,250.00 | |
| Overhead on same 15% | 16,993.00 | |
| Labor at $291 per ton | 72,445.00 | |
| Overhead on same 55% | 39,845.00 | |
| | 242,528.00 | |
| Profit 10% | 24,252.00 | |
| Total (equals $1,080 per ton) | | 266,780.00 |
| Machinery | | |
| New engines 2400 HP at $60 | 144,000.00 | |
| Superchargers and attachments | 70,000.00 | |
| Heating boiler | 12,500.00 | |
| | 226,500.00 7 | |
| Less 15% for used condition of engines | 31,800.00 | |
| Total | | 194,700.00 |
| Machinery other than main engines— | | |
| Material | 143,430.00 | |
| Overhead on same 15% | 21,515.00 | |
| Labor | 178,880.00 | |
| Overhead on same 55% | 98,385.00 | |
| | 442,210.00 | |
| Profit 10% | 44,220.00 | |
| Total | | 486,430.00 |
| Total cost of reproduction May 1942 | | 1,660,900.00 |
| Less depreciation 10/12 of 5% | | 69,093.44 |
| Value of McTarnahan as of May 1942 | | $1,591,806.56 |

### C. George W. Sturm

George W. Sturm, called as a witness by the respondent, is the Chief Ship Appraiser for the Maritime Commission and has been such for six years. He testified that, on May 16, 1942, in his opinion, the McTarnahan had a value of $1,670,000, which figure he determined on a replacement depreciated basis.

According to his testimony, it would cost to replace the McTarnahan new in 1942 $1,780,000, from which he deducted $21,000, representing the difference between the value of the McTarnahan engines and what it would have been if they had been new, which brought the figure down to $1,759,000, from which was deducted 5% depreciation for one year of age to give the result of $1,670,000.

---

6 The actual addition of these amounts totals $1,553,300, but Mr. Schrader testified to the total given above, which figure is necessary to work out his final estimated cost of reproduction as of May, 1942.

7 The total shown by Mr. Morrell is $224,500, an error of $2,000.

Mr. Strum's estimate of replacement cost was made on the basis of breaking the vessel down into units and applying a unit price. This breakdown is as follows:

| | |
|---|---|
| Hull Steel | |
| 2347 tons at $300 | $704,100.00 |
| Outfit | |
| 275 tons at $1,000 | 275,000.00 |
| Machinery | |
| 2300 SHP at $200 | 460,000.00 |
| Superchargers | 52,765.00 |
| Total | $1,491,865.00 |
| Design, Insurance, etc. | 288,135.00 |
| | 1,780,000.00 |
| Less for used engines | 21,000.00 |
| Net Reproduction cost May 1942 | 1,759,000.00 |
| Less 5% depreciation | 89,000.00 |
| Value of McTarnahan May 16, 1942 | $1,670,000.00 |

### VIII. Appraisal of the Experts' Testimony.

Both sides in this cause criticize the methods used by the experts testifying for the other. Respondent contends that the libellant's witnesses merely applied a rule of thumb method based on deadweight tonnage costs which it stigmatizes as arbitrary and misleading since deadweight tonnage is a measure of cargo capacity and not a measure of the quantity or quality of the materials that make up the ship. To some extent, at least, the criticism of respondent of the method of valuation employed by libellant's experts seems justified.

On the other hand, the experts of the respondent are not entirely free from the charge of having applied a rule of thumb method of valuation. The breakdown of a ship into three categories, and the applying of an average unit cost to that breakdown, it seems to me, is by no means the detailed estimate of cost the respondent argues it to be. It, too, is a rule of thumb, so to speak, although, perhaps, not as general as that used on behalf of the libellant.

If the respondent's method of cost estimation was other than an approximation of costs, we would expect to find them in agreement on the basis facts. Yet, such is not the case. For example, Schrader sets the hull steel at 2,290 tons, Morrell at 2,413 tons, and Sturm at 2,347 tons. They apply respectively to these weights $250, $295.48, and $300 per ton. With respect to outfit, Schrader uses 450 tons, Morrell 247 long tons or 254 tons, and Sturm 275 tons. To this, they applied respectively the prices of $900, $1,080 and $1,000. The same variances may be demonstrated less easily with respect to the third category—the machinery.

I do not think that I can justifiably accept the valuation of any one particular witness since all of them seem to me to be in a sense approximations or reasonable guesses as to what that value should be. They range from a low of $1,591,806.56 in the case of Morrell to a high of $2,310,000 in the case of Donald. As a matter of interest, the average of all their opinions is as follows:

| | |
|---|---|
| Szepinski | $ 2,258,000.00 |
| Donald | 2,310,000.00 |
| Stanley | 2,307,630.00 |
| Schrader | 1,750,500.00 |
| Morrell | 1,591,806.56 |
| Sturm | 1,670,000.00 |
| Total— | $11,887,936.56 |
| Average— | 1,981,132.76 |

It is only fair to state that the libellant attacks the figures given as their conclusions by the respondent's witnesses on a number of points. The libellant's arguments in this respect appear at length in its main brief and, I am convinced, demonstrate that certain basic errors in the application of the respondent's method of valuation have been made. For reasons which appear hereafter, I do not think it necessary to set these arguments out at length. Suffice it to say that I believe the amounts testified to by respondent's witnesses should be increased to some extent at least.

However, it seems to me that a more satisfactory yardstick for the determining of the value of the McTarnahan exists in this case. I refer to the known costs of the St. James which was the McTarnahan rebuilt. This comparison will be made in a later section of this report.

## IX. Comparison of McTarnahan and St. James.

Following the torpedoing of the Mc-Tarnahan in May of 1942, the hull of that vessel was rebuilt by Alabama Drydock & Shipbuilding Company at Mobile. At the time of the reconstruction of the vessel, copies of the original plans of the Mc-Tarnahan were furnished the shipyard, and from these plans the vessel was rebuilt so that it was, with the exception of the machinery, practically an identical ship. The principle change was in the main engines of the St. James. Instead of duplicates of the McIntosh engines originally installed in the McTarnahan, two Cooper-Bessemer engines of considerably lower horsepower were installed.

▆ Although there was some indication by Mr. Schrader that the reconstruction of the hull of the McTarnahan into the motor vessel St. James resulted in an improvement or betterment of the ship, I am satisfied from all of the evidence before me that, with the exception of the main engines and machinery, the two vessels were, to all intents and purposes, duplicates. Such additions or changes as were made in the St. James appear to have been of a minor nature, or part of the National Defense features that were then being added to many merchant ships. In determining the valuation in this case, such national defense features are to be ignored.

We may, therefore, accept as a fact that the St. James had the same characteristics as the McTarnahan, except that the main engines produced a shaft horsepower of 2,400 while the McTarnahan produced a shaft horsepower of 3,400.

▆ I conclude, therefore, that for purposes of determining reconstruction costs or replacement costs, a proper comparison can be made between the McTarnahan and the St. James with corrections being added for the larger horsepower of the McTarnahan.

▆ Respondent has argued that the main engines of the McTarnahan, being rebuilt second-hand engines, necessitates a reduction in the value of the McTarnahan in 1942 on a reconstruction basis from the cost of new engines. It seems perfectly clear to me from the evidence that the rebuilding of the McTarnahan engines was so thorough that to all intents and purposes they were the equivalent of new engines and, if sold in the market, would have brought an equivalent price. I do not think, therefore, that any such deduction should be made as urged by the respondent.

## X. Determination of 1942 Construction Costs.

The Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1735 et seq., imposes on the Maritime Commission the duty of determining pre-war construction costs of various vessels being offered for sale by the Maritime Commission and the domestic war cost of such vessels. The Act requires a determination of pre-war construction costs as of January 1, 1941 and domestic war costs as of 1944.

It appears that Mr. Schrader made most of the determinations of pre-war and domestic war costs for these various vessels and, in fact, determined these costs for the St. James. As a matter of fact, it appears that Mr. Schrader's estimate of the replacement cost of the McTarnahan is based in part at least on data and facts obtained at the time of the determination of the pre-war costs of the St. James.

Section 3, subdivision (e) of the Ship Sales Act of 1946 defines domestic war costs as follows: " 'Domestic war cost' as applied to any type of vessel means the average construction cost (without national defense features) as determined by the Commission, of vessels of such type delivered during the calendar year 1944 * * *."

Mr. Schrader testified that, if only one vessel designated as a type under the Act had been constructed, then the costs determined would not be average costs but would be the actual cost of that particular vessel. It seems clear, therefore, since Mr. Schrader in fact made these determinations for the Maritime Commission, that the determination of costs for the St. James which appear in evidence is made on the basis of the construction of a single ship rather than as an average cost based on the construction of a number of ships of that particular type.

The costs of the St. James as determined by the Maritime Commission under the Ship Sales Act are as follows:

Pre-war domestic cost—January 1941—$1,657,500.00
Domestic war cost — 1944— 2,149,550.00

It will be observed that the domestic war cost of the St. James is 30% higher than the pre-war domestic cost of that vessel. The explanation for this increase lies in the fact that the cost data in the Maritime Commission files on the T2-SE-A1 tankers shows a rise of 30% in costs of building those tankers between January, 1941 and 1944.

Mr. Schrader testified that this 30% increase in cost was established by certain curves constructed by the Maritime Commission on the basis of their cost data, and that they had two sets of such curves —one for tankers and one for dry cargo vessels, neither of which were comparable.

While I have held that a comparison between the McTarnahan, or a ship of its class, and a T2-SE-A1 tanker is improper because of the disparities between the vessels, nevertheless, witnesses for both the libellant and the respondent in this case have, for the purpose of determining the rise in the cost of construction of vessels apparently been in agreement as to the propriety of determining that increase of cost on the basis of the program for the construction of the T2 type tanker. I, accordingly, accept the T2 program as the basis for determining the increase in cost of tankers between 1941 and 1944, and further accept the cost curves of the Maritime Commission for the T2 type tanker. This cost curve appears in the record as respondent's Exhibit 10, Enclosure B.

Mr. Schrader testified that, between January 1941 and May 15, 1942, those costs increased 12½% and, in fact, applied that percentage of increase to the pre-war domestic cost of the McTarnahan determined on the basis of his pre-war domestic cost of the St. James in order to arrive at the replacement cost of the McTarnahan as of May, 1942.

An examination of respondent's Exhibit 10, Enclosure B, shows that, in point of fact, the increase of cost of the construction of the T2 tanker between January 1941 and May 15, 1942 was approximately 25% and that, thereafter, between '42 and '44, there was an approximate increase of 5% in the costs. In order, therefore, to determine from a given pre-war domestic cost in January 1941 the cost in May of 1942, in my opinion, that pre-war domestic cost must be increased by 25% rather than by 12½%, as was the case with Mr. Schrader's estimate.

XI. Construction Cost in May 1942 of the McTarnahan.

Having come to the conclusion that it is proper to determine, in the case of the McTarnahan, the replacement cost of such tanker as of May, 1942, by the addition of 25% to the pre-war domestic cost of January, 1941, it follows that by the application of this increase, we may determine what the best estimates available show to be the construction cost of the McTarnahan in May of 1942 by this method.

As I stated in the foregoing, in my opinion, the only substantial difference between the McTarnahan as she was on May 15, 1942 and the St. James as she was reconstructed is found in the difference in the main engines and is, accordingly, a matter of difference in horsepower. This difference in horsepower is 1,000 shaft horsepower. It seems to me, therefore, that we can fix the pre-war domestic cost of the McTarnahan in January, 1941, by adding to the pre-war domestic cost of the St. James whatever sum it would have cost to bring the shaft horsepower of the St. James up to 3,400 in order to make that ship exactly comparable to the McTarnahan.

From the evidence before me, it seems proper to fix as the cost of each additional horsepower added to a ship the sum of $200. We should add, therefore, to the pre-war domestic cost in 1941 of the St. James the sum of $200,000 in order to obtain the pre-war domestic cost of the McTarnahan. This sum should then be increased by 25% and the resulting figure will be the construction cost of the Mc-

Tarnahan in May of 1942. Making these computations, the result appears as follows:

| | |
|---|---|
| Cost—January 1941 of St. James | $1,657,500.00 |
| 1000 horsepower at $200.00 | 200,000.00 |
| Pre-war domestic cost of McTarnahan | 1,857,500.00 |
| 25% increased costs | 464,375.00 |
| Replacement or construction cost of Mc-Tarnahan May, 1942 | $2,321,875.00 |

## XII. The Value of the McTarnahan.

The libellant has sought to show in a variety of ways that the market value of the McTarnahan actually exceeds the total amount asked for in its libel. The theory underlying this argument is that construction cost or replacement cost is actually only a minimum value of a ship, and that, in all cases, the market value exceeds the construction cost of a new ship.

It is true that by comparing the Mc-Tarnahan to the four Sinclair ships, and on the basis of a capitalization of earning, both, actual in the case of the sistership of the McTarnahan, and theoretical, a somewhat higher figure can be obtained. I think, however, that in determining value which, under the authorities set forth initially in this report, must be a reasonable conclusion based on available evidence, a court should not enter into the realm of speculation but, in so far as possible, base its conclusions on hard facts or, at least, on facts which are more nearly certain and definite than a theoretical capitalization of earnings. Accordingly, I have concluded that I must accept as the best evidence obtainable of the market value of the McTarnahan its reconstruction cost as of May, 1942. I have, in the preceding section of this report, in fact computed the reconstruction cost of the McTarnahan in that month and year.

The McTarnahan at the time of its loss was 10 months old and, while there seems to be some dispute among the expert witnesses as to the propriety and the rate of depreciating the McTarnahan, nevertheless, it seems to me that 10 months service would have the effect of reducing in some manner the market value of the McTarnahan irrespective of the scarcity of available ships.

Five per cent per year seems to be an accepted peacetime rate of depreciation. It seems to me that the demand for ships of all types which was prevalent in May of 1942 should operate to prevent depreciation at the normal peacetime rate. I agree with one of libellant's witnesses who testified that, in view of the state of the market, he was of the opinion that a rate of only 2½% per year should be applied. In order, therefore, to determine the value of the McTarnahan in May, 1942, I am of the opinion that its reconstruction cost should be depreciated at the rate of 2½% for 10 months. This computation works out as follows:

| | |
|---|---|
| Reconstruction cost of McTarnahan | $2,321,875.00 |
| Less 10 months depreciation at 2-1/2% | 48,372.39 |
| Value of McTarnahan May, 1942 | $2,273,502.61 |

I find, therefore, the value of the McTarnahan in May of 1942 to have been $2,273,502.61.

In checking this figure against the testimony before me, it seems to me that it is in line with the testimony of the expert witnesses. It is slightly under the values set by the libellant's witnesses and, while higher than the values set by the respondent's witnesses, not so high as to cause me to feel that they cannot be reconciled. As a matter of fact, I believe that at least some of the criticisms of their testimony by the libellant are justified and that if the testimony was corrected, the figures would approach the value figure I have adopted.

It seems to me that the figure adopted is the most reasonable conclusion I can reach on the evidence.

## XIII. Interest.

Libellant, in its brief, raises anew the question of the award of interest, but I am bound by the decision of this court in the case of the Virginia, when it held that interest at 4% should be allowed as part of the award from the date of the commencement of the action. See 73 F. Supp. 622, at page 642.

### XIV. Computation of Amount Due Libellant.

| | |
|---|---:|
| Just compensation value of McTarnahan | $2,273,502.61 |
| Less payment on account | 1,227,389.34 |
| | 1,046,113.27 |
| Interest at 4% from May 11, 1944 (the date of commencement of the cause) to date of payment | |
| Total | |

### I. Introductory.

On February 17, 1948, I filed my report as Special Commissioner, setting forth a recommended valuation of the William C. McTarnahan as of May, 1942 in the amount of $2,273,502.61. On April 7, 1948, I further filed recommended findings of fact and conclusions of law after affording counsel for both sides the opportunity to submit proposals of findings.

On June 9, 1948, on the motion of the proctor for the respondent, an order dated June 9, 1948 was entered re-referring the matter to me, as Special Commissioner, for the presentation to me of a certified copy of an application by National Bulk Carriers, Inc. to the United States Maritime Commission dated March 8, 1948, and leaving to my discretion the character and scope of evidence to be received with respect to the subject matter of said application.

Accordingly, on August 5, 1948, I reconvened the hearings in the above case and received in evidence as respondent's Exhibit 11 the application referred to in the order of re-reference. Testimony of witnesses for the libellant, viz., D. K. Ludwig, Clemens Roeder and Harold C. Lenfest, was also taken.

At the conclusion of the hearing on August 5, 1948, on motion of the proctor for the respondent, the hearing was adjourned to August 23 for the purpose of affording the respondent an opportunity to examine the testimony adduced on behalf of the libellant in explanation of respondent's Exhibit 11, and to call witnesses or present additional evidence in rebuttal to the testimony offered on behalf of the libellant.

On August 23, 1948, I reconvened the hearings, at which time a motion for a continuance was made by the proctor for the respondent on the ground that the Department of Justice had not as yet received a report from the Maritime Commission with its recommendations concerning the testimony produced for the libellant on August 5, 1948. A further ground offered for the continuance was the absence of Mr. Rosenberg, chief proctor for the respondent in this cause.

I denied the application for continuance stating that I would be willing to receive an application to reopen the hearing for presentation of additional evidence on motion of the respondent at any time prior to the filing of my supplemental report pursuant to the order of re-reference. To date, no such application for re-opening has been made.

Transmitted herewith are the stenographic minutes of the hearing on August 5, 1948, together with the exhibits.

### II. The Evidence Produced at the Hearing.

At the hearing, respondent offered a certified copy of the application of National Bulk Carriers, Inc. filed with the United States Maritime Commission on or about June 8, 1948, pursuant to Sections 9 and 37 of the Shipping Act of 1916, as amended, 46 U.S.C.A. §§ 808, 835, for leave to transfer the motor vessel "Petrofuel" owned by National Bulk Carriers to the Panamanian Flag and Panamanian registry.

The respondent called particular attention to a rider attached to paragraph 5 of the application headed, "Reasons for Sale or Transfer". Said rider is in the following language: "This is a diesel ship, incapable of operating continuously above nine and one-half (9-1/2) knots. Profitable operation is precluded through extremely high maintenance cost brought about by frequent machinery breakdowns. This vessel's inefficiency makes it impossible for us to meet trade competition while operating under American Flag. Furthermore, due to the size and speed of this vessel, it does not fit in with the remainder of our fleet which are either high speed tankers or T-2s. This vessel is a sistership to the M. S. St. James presently owned by the U. S. Maritime Com-

·mission. Also, this vessel was built by us with our own capital and without any aid in construction from the U. S. Government."

The theory of the respondent in offering this exhibit is that the quoted statement is inconsistent with the testimony produced by the appellant at the first hearing with respect to the fact that the William C. McTarnahan was a "good eleven knot ship", and is also inconsistent with the further testimony offered on behalf of the libellant that the machinery and engine construction of the William C. McTarnahan was the equivalent of new machinery and engines. Parenthetically, it might be observed that there is no dispute concerning the fact that the William C. McTarnahan, and the Petrofuel were sister ships and, to all intents and purposes, identical. Since the speed of the McTarnahan, which was found by me to be eleven knots, entered into its valuation, the theory of the respondent seems to be that the inconsistency shown by the application for transfer to foreign registry of the Petrofuel throws doubt on the conclusion as to the speed of the McTarnahan, an essential fact in its valuation.

In rebuttal to the inconsistency between respondent's Exhibit 11 and the evidence offered by the libellant at the main hearing, libellant produced three witnesses who testified before me at the first hearing. The substance of the testimony of these witnesses is that the Petrofuel suffered two very serious accidents—the first, in December, 1944, was damage to machinery due to a latent defect resulting in a broken connecting rod which badly tore up the starboard engine of the Petrofuel. Due to conditions then existing in the industry, permanent repairs could not be made and, accordingly, temporary repairs were made to the satisfaction of the Classification Society which, for its approval, required the engine to be run at reduced speed. The testimony further shows that these repairs of a temporary nature were never corrected.

Later, In October of 1945, while still under Government charter, the Petrofuel had a serious fire in the engine room while discharging cargo in Perth Amboy, New Jersey. In extinguishing the fire, the engine room was subject to water damage from submersion as well as damage by fire. The shortage of materials and equipment was still in existence at the time of the fire, which necessitated temporary repairs. The experience of the libellant with the Petrofuel after the fire in October, 1945, was that the ship necessarily had to be operated at a greatly reduced r. p. m., so that it eventually concluded to sell the vessel to foreign registry.

If, therefore, the statement appearing in the application for transfer, respondent's Exhibit 11, be taken as inconsistent with the testimony of libellant at the main hearing, it seems to me that that inconsistency has been completely clarified and explained by the testimony of the three witnesses called by the libellant at the rehearing, particularly so since the respondent has not sought to produce any testimony or evidence to contradict that offered for the libellant in rebuttal to respondent's Exhibit 11.

I should call attention to the fact that, at the main hearing, evidence was introduced to show the actual earnings of the Petrofuel while operating under W. S. A. Charter down to the end of 1944, which showed a rate of earnings justifying by comparison at least the valuation recommended for the McTarnahan in my first report.

Furthermore, the finding of the speed of the McTarnahan, which entered into the determination of its value, was based upon the actual performance records of the McTarnahan down to the date of her loss, being a record of a total of eleven voyages, which indicated that the McTarnahan was capable of performing at approximately the speed which entered into the calculation of her value.

### III. Conclusion.

I, therefore, conclude by reason of the foregoing that any inconsistency between the libellant's testimony at the main hearing and respondent's Exhibit 11 has been satisfactorily explained. I further conclude that there is no reason to modify in any part my first report and recommended findings of fact and conclusions of law heretofore submitted to the court.